Roger IMDIEKE, Respondent,

v.

BLENDA–LIFE, INC., et al., Appellants.

No. C1–84–1036.

Court of Appeals of Minnesota.

Feb. 19, 1985.

Review Denied April 26, 1985.

Marcus M. Baukol, II, Cold Spring, for respondent.

Kevin S. Carpenter, St. Cloud, for appellants.

Heard, considered, and decided by PARKER, P.J., and SEDGWICK, and LESLIE, JJ.

## OPINION

LESLIE, Judge.

A jury returned a $114,000 verdict against appellant Blenda-Life, Inc. and in favor of respondent, Roger Imdieke, for loss of milk production and injury to dairy cows caused by a feed supplement manufactured and sold by Blenda-Life, Inc.

Blenda-Life, Inc. moved for judgment notwithstanding the verdict (JNOV) or a new trial. The trial court denied the motions, but reduced the amount of incidental damages from $10,000 to $5,000. We affirm in part, reverse in part and remand.

## FACTS

Roger Imdieke, 30, has been involved in dairy farming all his life. In the fall of 1976 he was approached by Arthur White, the owner of Blenda-Life, Inc., who suggested purchase of Blenda-Life supplement. He told Imdieke, that "the product would increase milk production to 15,000 pounds of production per cow per year and maintain the cow's health and reproductive capacity."

Imdieke purchased the supplement and used it on his herd for four and one-half years. Initially, the cows produced about 13,000 pounds of milk per cow per year, but their production fell steadily. In the latter part of the four and one-half-year period, eight cows died suddenly. Imdieke consulted his veterinarian who could not explain the cows' health problems and declining production. The veterinarian told Imdieke to consult with Dr. William Olson, a nutritionist and veterinarian from the University of Minnesota veterinary school.

Dr. Olson diagnosed the herd as suffering from vitamin D toxicosis and identified the Blenda-Life supplement as the cause of the problem. He determined that the supplement contained 200 times the industry-recognized amounts of vitamin A and D and was deficient in protein and phosphorus. There was no testimony justifying these levels of vitamins in the supplement.

Donald Bakehouse, an expert in farm loss evaluations, determined Imdieke's losses as follows:

| | |
|---|---|
| Loss of daughters entering the herd | $2,840 |
| Lost income from dead & wasted cows sold | $35,172 |
| Lost value of dead & wasted cows | $15,340 |
| Lost income due to milk production | $43,171 |
| Loss of future income | $23,274 |
| Hauling of dead cows to the U of M | $768 |
| Loss interest income | $31,151 |
| Total | $151,716 |

These figures were uncontroverted. Bakehouse based his appraisal of loss on Imdieke's six years of detailed farming records which included, among other information, each cow's food intake, the pounds of milk produced, the percentage of butter fat in the milk, the length of lactation (milk producing days per year), length of time between the cow's calves, and the average production of the entire herd. His appraisal was also based on information and procedures normally used in the field of farm loss evaluation, and experience with other Blenda-Life herds.

The jury found by special verdict that defendant breached its warranties and caused plaintiff to suffer $57,000 in general damages, $10,000 in incidental damages and $47,000 in consequential damages. The trial court denied defendant's motion for JNOV or new trial, but reduced incidental damages to $5,000.

## ISSUE

Did the trial court err in denying defendant's motion for JNOV or new trial?

## ANALYSIS

*Denial of JNOV*

■ The standard to be applied in determining the propriety of granting a motion

for JNOV is whether there is any competent evidence reasonably tending to support the verdict. *Newmaster v. Mahmood,* 361 N.W.2d 130 (Minn.Ct.App.1985); citing *Kantorowicz v. VFW Post, No. 230,* 349 N.W.2d 597 (Minn.Ct.App.1984).

A motion for JNOV admits every inference reasonably to be drawn from the evidence as well as the credibility of the testimony for the adverse party. *Seidl v. Trollhaugen, Inc.,* 305 Minn. 506, 232 N.W.2d 236 (1975). Only where the facts are undisputed and reasonable minds can draw but one conclusion does the question become one of law for the court. *Kramer v. Kramer,* 282 Minn. 58, 162 N.W.2d 708 (1968).

Here, the facts are basically uncontroverted. Therefore, the court properly denied the motion.

*Denial of New Trial*

A motion for a new trial made upon the ground that the jury verdict is not supported by the evidence should be granted only in cases "where the preponderance of the evidence clearly suggests jury mistake, improper motive, bias or caprice." *Conover v. Northern States Power Co.,* 313 N.W.2d 397, 408 (Minn.1981), citing *Koenig v. Ludowese,* 308 Minn. 380, 243 N.W.2d 29 (1976).

Viewing the evidence in a light most favorable to the verdict, there is ample evidence to support the verdict for general and consequential damages, but there is insufficient evidence to support the verdict for incidental damages.

*General Damages*

To establish a warranty claim plaintiff must prove (1) the existence of a warranty, (2) a breach, and (3) a causal link between the breach and the alleged harm. *Peterson v. Bendix Home Systems, Inc.,* 318 N.W.2d 50, 52–53 (Minn.1982).

There is uncontroverted evidence of a warranty and its breach. Blenda-Life contends that Imdieke failed to prove a causal relationship between the harm suffered and the breach. The only evidence of causation was Imdieke's testimony that the supplement for which he paid $78,584 is worth only $18,000 to $20,000 in its defective condition. He based this opinion on his knowledge of the cost of the ingredients in the supplement and the fact that his cows produced some milk. ($78,584 – $20,000 = $58,584, the jury assessed $57,000 in general damages.)

Blenda-Life claims Imdieke's testimony did not establish a causal link because Imdieke was not qualified to evaluate the product's worth in its defective or unwarranted condition. He could not accurately calculate the value of the feed because the formula is a trade secret and the costs of ingredients of cattle feed is not within the common knowledge of a dairy farmer.

We disagree. Blenda-Life relies on *Settell's Inc. v. Pitney Bowes, Inc.,* 305 N.W.2d 896 (Neb.1981), where the court found that plaintiff failed to prove its damages in a product liability case. However, in *Settell* the plaintiff presented no evidence as to the value of the product in its defective condition. Here, Imdieke testified that the defective product was only worth between $18,000 and $20,000.

In *Peterson,* Mrs. Peterson bought a mobile home then sued the manufacturer for breach of warranty claiming formaldehyde fumes made her home uninhabitable. Plaintiff testified that if she sold her home she doubted that she could get $1,000 for it. The jury awarded her $15,000. The supreme court upheld the verdict, noting that her testimony, coupled with the manufacturer's repeated refusal to buy back the home, was sufficient to sustain the award of damages.

The trial court did not err in finding Imdieke, a dairy farmer operating a sizable farm, knew the costs of grains and other components in the feed he gives his cattle. If Mrs. Peterson, who was not a real estate appraiser and had no experience in valuing property, was qualified to testify as to the value of her formaldehyde ridden home, then Imdeike, who has been in the dairy farming business his entire life was quali-

fied to testify regarding costs of various grains and nutrients he feeds his dairy cattle.

Blenda-Life contends that even if Imdieke is qualified to testify, the damage award is speculative because Imdieke cannot accurately calculate the costs of the proportions of supplement ingredients since that is a trade secret.

■ Damages do not have to be proved with mathematical certainty. The evidence need only reasonably support the verdict for damages to be sustained. Therefore, we sustain the verdict for general damages.

*Consequential Damages*

■ Consequential damages are the damages which naturally flow from the breach of a contract, or may reasonably be contemplated by the parties as a probable result of a breach of the contract. The jury assessed $47,000 in consequential damages.

Bakehouse, Imdieke's expert, appraised the consequential losses at $151,700. His testimony was uncontested as to the extent and value of the lost production during the years the cattle were eating Blenda-Life.

Blenda-Life contends that Bakehouse's projected loss of milk production is in error. Bakehouse calculated the projected milk loss by comparing Imdieke's milk production in 1981 when the milk production was at its worst level on the Blenda-Life program and 14 months after Imdieke stopped feeding the cattle Blenda-Life. Using these figures he then projected losses three years into the future.

Blenda-Life claims this comparison assumes that the type of production Imdieke would have received, had Blenda-Life not been defective, is the same as the production Imdieke actually received in October 1982, a full 26 months after Imdieke stopped feeding his cattle Blenda-Life. Blenda-Life claims there is no basis for this assumption.

However, Dr. Olson, the University veterinarian, based on his research of five Blenda-Life herds, testified that after cattle are taken off Blenda-Life, it takes up to three years for their bodies to recover from the abnormal build up of vitamin D.

Dr. Olson further testified that Imdieke's cows were tested two years after they stopped taking Blenda-Life and their blood tests were just beginning to come within normal readings. Therefore, Bakehouse's projections are well grounded and not speculative.

Blenda-Life relies on *Sampson v. Penney*, 151 Minn. 411, 187 N.W. 135 (1922), to support the claim that Imdieke is not entitled to damages for loss of daughters entering the herd. In *Sampson* the supreme court held that consequential damages did not include the value of an increased bee population had the original bees not been diseased. It reasoned that such damages, under the circumstances were too remote.

■ The ability to calculate the number of larvae bees in each of several colonies is probably impossible. However, it is not impossible to accurately predict how many calves a certain number of cows will have during a given period. Therefore, *Sampson* is distinguishable, and we find the consequential damages for loss of daughters entering the herd must be sustained as a reasonably foreseeable consequence of the contract breach.

■ There is a $1,000 difference between the testimony of Imdieke and Bakehouse regarding the value of the eight dead cows and the four that had to be sold due to their "wasting condition." The record reveals that Imdieke replaced the dead and "wasting" cows with less valuable cows. This accounts for the $1,000 difference in Imdieke's testimony and Bakehouse's testimony. These damages are sustainable.

Blenda-Life also disagrees with the interest component of the damages. Blenda-

Life contends this is unallowable pre-judgment interest because it was not based on a sum certain.

■ Bakehouse testified that Imdieke was forced to borrow money because his milk production was not generating enough money to pay operating expenses. Operating expenses included the $78,000 purchase of Blenda-Life. The interest due on these operational debts is consequential because the evidence shows the debts would not have had to be taken out absent defect in product.

*Incidental Damages*

Incidental damages include "expenses reasonably incurred in inspection * * * of goods rightfully rejected, and * * * any other reasonable expense incident to the delay or other breach." Minn.Stat.Annot. 336.2-715.

The jury assessed incidental damages at $10,000, and the trial court reduced them to $5,000 noting that "the only evidence presented to the jury in support of incidental damages was $5,000." This represented the difference in the cost of purchasing a larger silo which was necessary in using the Blenda-Life program because it required feeding the cattle more corn silage.

Imdieke testified that he continued to need and use his large silo after quitting the Blenda-Life program. Therefore, the cost of the larger silo was not incurred as a result of the breach, but rather as a result of his choice to use an unconventional feeding program.

■ Since the evidence is insufficient to sustain the assessment of $5,000 in incidental damages we reverse on this issue.

### DECISION

We affirm the trial court on general and consequential damages, reverse on incidental damages, and remand for entry of judgment consistent with this opinion.