Kent DUXBURY, et al., Respondents,

v.

SPEX FEEDS, INC., Appellant,

David Shanahan, Respondent.

No. A03–1456.

Court of Appeals of Minnesota.

June 15, 2004.

Peter C. Sandberg, Kari C. Stonelake-Hopkins, Dunlap & Seeger, P.A., Rochester, MN, and Scott Kerry Springer, Adams, Rizzi & Sween, P.A., Austin, MN, for appellant.

Charles A. Bird, Jeremy R. Stevens, Bird & Jacobsen, Rochester, MN, for respondents Kent Duxbury, et al.

Scott V. Kelly, Aaron J. Glade, Farrish Johnson Law Office, Mankato, MN, for respondent David Shanahan.

Considered and decided by WRIGHT, Presiding Judge; SCHUMACHER, Judge; and WILLIS, Judge.

## OPINION

WRIGHT, Judge.

Respondents-farmers brought an action against appellant-feed producer after feed manufactured by appellant caused illness in respondents' gestating sows. A jury returned a verdict in respondents' favor on their claims of negligence, products liability, consumer fraud, and breach of express and implied warranties. Appellant moved for judgment notwithstanding the verdict (JNOV), challenging both the legal and factual bases for the verdict. The district court denied the motion. We affirm in part, reverse in part, and remand.

## FACTS

Respondents Ken, Vickey, Steven, and Marlys Duxbury are farmers who raise corn and hogs. In February 2000, the Duxburys' sows began having gestational problems. When veterinarians were unable to confirm that an infectious disease was the source of the problem, the Duxburys had their hogs' feed tested in spring and summer 2000. This testing showed toxins in the feed. After the Duxburys discontinued use of the feed in August 2000, their sows recovered.

The Duxburys received the suspect hog feed from appellant Spex Feeds, Inc. Spex manufactures and sells feed and feed additives. Spex also operates a "grain bank" at which farmers deposit corn and receive a proportional share of the corn commingled in the bank. In 1999, the Spex grain bank comprised deposits from 38 farmers in nine grain bins.

In 1998 and 1999, the Duxburys deposited corn in the Spex grain bank. In late 1999, the Duxburys arranged for Spex to provide hog feed from their share in the grain bank.[1] They allege that Spex did not take reasonable steps to control moisture levels or monitor for mold or toxins in the grain bank.

Spex manufactured the feed by grinding grain bank corn and mixing in soybean meal, medicines, and nutritional supplements. The feed additives and supplements made up approximately 12 to 14 percent of the feed. The Duxburys were charged for all components of the feed except the corn. They also were charged a fee for the grinding, mixing, and delivery of the feed.

Respondent David Shanahan, a salesperson for Spex, had been selling feed to the Duxburys since 1990. In 1997, Shanahan invested in the Duxburys' hog farming operation. In return, he received 20 percent of the sows' surviving newborn pigs. Aside from assisting the Duxburys in the course of his employment at Spex, Shanahan did not participate in the management or operation of the Duxburys' farm and did not share in their profits or losses.

In October 2001, the Duxburys brought an action against Spex. Under the terms of a stipulation between the Duxburys and Spex, Shanahan was joined as a co-defendant. According to Spex's theory, Shanahan was a joint venturer whose knowledge about Spex should be imputed to the Duxburys. The case proceeded to trial. Following Shanahan's testimony, the district court held as a matter of law that a joint venture between Shanahan and the Duxburys did not exist and dismissed the claims against Shanahan.

Later during the trial, the Duxburys called Dr. Michael Behr, a forensic econo-

---

1. The Duxburys also claim that some of the corn was taken from sources other than the grain bank. Because the actual origin of the corn is not relevant to the legal issues raised on appeal, it is sufficient to rely on Spex's representation that corn was taken from the grain bank.

mist, who testified about the losses suffered by the Duxburys. Without taking into account inflation, he determined a total loss of $246,230. He calculated an additional $39,730 to account for inflation from the time of the losses.

Following an extensive charge conference, the jury was instructed on negligence, products liability, consumer fraud, and violation of express and implied warranties. The jury returned a verdict for the Duxburys, assessed comparative fault of 90 percent to Spex and 10 percent to the Duxburys, and awarded $247,000 in damages and $25,000 in interest.

Spex brought a motion for JNOV or a new trial, which the district court denied. This appeal followed.

## ISSUES

I. Is the Uniform Commercial Code's "sale" requirement satisfied when a grain bank depositor, regulated under Minn. Stat. ch. 236, purchases feed from the grain bank?

II. Did the district court err in formulating the special verdict form for the claims brought under the Minnesota Consumer Fraud Act?

III. Does the Minnesota Commercial Feed Law supply a negligence per se standard for grain bank operators?

IV. Did the district court err in concluding as a matter of law that the Duxburys and Shanahan did not engage in a joint venture?

V. Does prejudgment interest calculated under Minn.Stat. § 549.09 preclude a jury award of interest on damages?

VI. Is there sufficient evidence to support the verdict?

## ANALYSIS

### I.

Spex argues that, because under the grain bank statutes the Duxburys kept title to the corn used to manufacture the feed, the "sale" requirement under the Uniform Commercial Code was not satisfied. *See generally* Minn.Stat. §§ 236.01, .03 (grain bank provisions), .2–106, .2–313, .2–314(UCC) (2002). As a result, Spex contends, the remedies of warranty and products liability are not available. In addressing this issue, we consider the scope and effect of regulation in this field to determine whether these remedies are abrogated. We review de novo questions of law, including matters of statutory interpretation. *Modrow v. JP Foodservice, Inc.*, 656 N.W.2d 389, 393 (Minn.2003).

The licensing and operation of grain banks is governed by Minn.Stat. §§ 236.02–.09 (2002). When grain is deposited in a grain bank, the depositor obtains a receipt indicating the type and quantity of the grain. Minn.Stat. § 236.03. The depositor may later demand that the grain be sold or that the grain bank redeliver grain of equivalent type and quantity. *Id.* at § 236.04. As a condition of licensing, the grain bank must post a bond sufficient to satisfy the claims of all depositors. *Id.* at § 236.02, subd. 5. A depositor may bring an action to recover against the bond, which is the only remedy that Minn.Stat. ch. 236 specifically grants to depositors. *Id.*, subd. 6.

Under Minn.Stat. § 236.06, the grain bank receives a possessory lien on the grain for all charges arising out of the storage and processing of the grain. This provision establishes the sole form of action for recovering against this lien and states that "[i]n the event of inconsistency between this section and the Uniform Commercial Code, this section applies." Because the language of section 236.06

plainly refers to "this section" and not the entire chapter, other UCC remedies remain available in grain bank cases that do not involve the grain bank's possessory lien.

■ The legal relationship between a grain bank and a depositor is controlled by the common law of bailment. *Torgerson v. Quinn–Shepherdson Co.*, 161 Minn. 380, 382, 201 N.W. 615, 616 (1925). A bailment occurs when goods are delivered, without transferal of ownership, under an express or implied agreement that the goods will be returned. *Wallinga v. Johnson*, 269 Minn. 436, 438, 131 N.W.2d 216, 218 (1964). When grain is deposited in a grain bank, a bailment is created that gives rise to the grain bank's duty of care in keeping the grain. *Production Credit Ass'n of St. Cloud v. Fitzpatrick*, 385 N.W.2d 410 (Minn.App.1986). If the grain is damaged or lost, the operator has the burden to show lack of negligence. *See Wallinga*, 269 Minn. at 438–39, 131 N.W.2d at 219. These principles are consistent with grain bank regulation under Minn.Stat. ch. 236, which recognizes that the depositor is the "owner" of the grain. *See* Minn.Stat. § 236.03. The Duxburys contend that, because the depositor is entitled only to grain of the same type and quantity, rather than the same grain as deposited, no bailment arises. This argument is without legal support. Since the origin of statutory grain bank regulation, the Minnesota Supreme Court has consistently found a bailment, regardless of whether the grain is identical. *See Torgerson*, 161 Minn. at 382–83, 201 N.W. at 616; *State v. Cowdery*, 79 Minn. 94, 96–97, 81 N.W. 750, 750 (1900); *Weiland v. Krejnick*, 63 Minn. 314, 316–17, 65 N.W. 631, 632 (1895).

■ Our canons of statutory construction provide that, when two statutes are in conflict, they shall be construed, if possible, to give effect to both. Minn.Stat. § 645.26, subd. 1 (2002); *State by Beaulieu v. Indep. Sch. Dist. No. 624*, 533 N.W.2d 393, 396 (Minn.1995). In addition, remedies under the UCC are expressly protected from implied repeal. Minn.Stat. § 336.1–104 (2002); *cf. Hampton Bank v. River City Yachts, Inc.*, 528 N.W.2d 880, 887 (Minn.App.1995) (concluding that statutory regulation of watercraft titles does not preclude the application of UCC), *review denied* (Minn. Apr. 27, 1995). The availability of a statutory remedy does not abrogate other common law remedies except by "express wording or necessary implication." *Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn.2000). Thus, although statutory regulation in a field may supply the standard of care, compliance with such regulations does not protect a party from common law actions. *Licha v. N. Pac. Ry.*, 201 Minn. 427, 431, 276 N.W. 813, 815 (1937); *see generally* 2B Norman J. Singer, *Statutes and Statutory Construction* § 50:05 (6th ed.2002).

■ Whether a transaction is governed by the UCC is a question of law, which we review de novo. *Valley Farmers' Elevator v. Lindsay Bros. Co.*, 398 N.W.2d 553, 556 (Minn.1987). A warranty action under Article 2 of the UCC requires a "sale," which is defined as "the passing of title from the seller to the buyer for a price." Minn.Stat. § 336.2–106(1) (2002). When a transaction involves both goods and services, we use the "predominant factor test" to determine whether the transaction is a sale under the UCC. *Valley Farmers' Elevator*, 398 N.W.2d at 556. In doing so, we examine whether the predominant factor in the transaction is the transfer of goods or the provision of services. *Id.* Relevant factors include the language of the contract, the business of the supplier, and the "intrinsic worth" of the goods involved. *Coakley & Williams, Inc. v. Shatterproof Glass Corp.*, 706 F.2d 456,

460 (4th Cir.1983). In practice, courts generally rely on the relative costs of the services and the goods. *See McCarthy Well Co. v. St. Peter Creamery, Inc.*, 410 N.W.2d 312, 315 (Minn.1987) (finding no sale where well builder billed $35,000 for services and $8,000 for well pump); *Valley Farmers' Elevator*, 398 N.W.2d at 556 (finding sale where elevator builder billed $120,000 for labor and more than $380,000 for materials); 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 9–2 (4th ed. 1995 & Supp.2003). Application of this analysis to circumstances where a buyer contributes raw materials to the finished product appears to be a matter of first impression in Minnesota.

■ It is undisputed that Spex is in the business of selling animal feed and feed supplements. Spex transferred a finished good, animal feed, to the Duxburys for a price. According to the receipts generated by Spex, the Duxburys were billed approximately $74 per ton for feed additives and supplements but only $8.50 per ton for the preparation and transport of the feed. Based on these facts, the predominant factor in the parties' transaction was the transfer of goods. We, therefore, conclude that the transaction was a sale.

That grain bank corn was used does not affect this analysis. Under Minn.Stat. § 236.04, a depositor cannot redeem a grain bank receipt once the depositor directs that the grain be used to make feed. Nor can the depositor demand the finished feed simply because the depositor's corn is a component. Compensation is required for the goods and services integrated into the finished product. Applying the definition of sale under Minn.Stat. § 336.2–106, title to the feed is not transferred until the depositor pays this price.

Because the legal effect of the grain bank statutes does not conflict with a finding that the UCC's sale requirement has been satisfied, the grain bank statutes do not abrogate remedies under the UCC. *Cf. Hampton Bank*, 528 N.W.2d at 887.

■ For a products liability claim, the plaintiff must demonstrate that a product was defective at the time it left the defendant's control and that the defect caused injury to the plaintiff. *Bilotta v. Kelley Co. Inc.*, 346 N.W.2d 616, 623 n. 3 (Minn. 1984). The policy underlying products liability is "to protect consumers from harm caused by defective products and to impose the costs of defective products upon the maker, who presumably profits from the product." *In re Shigellosis Litigation*, 647 N.W.2d 1, 6 (Minn.App.2002), *review denied* (Minn. Aug. 20, 2002). Since its publication, we have relied on Restatement (Third) of Torts when considering the law of products liability. *See Marcon v. Kmart Corp.*, 573 N.W.2d 728, 731 (Minn. App.1998), *review denied* (Minn. Apr. 14, 1998); *State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*, 572 N.W.2d 321, 324 (Minn.App.1997). Restatement (Third) of Torts § 1 (1998) takes a broad approach, imposing liability on any party who is "engaged in the business of selling or otherwise distributing products[.]" "One sells a product when, in a commercial context, one transfers ownership thereto either for use or consumption or for resale leading to ultimate use or consumption." Restatement (Third) of Torts § 20(a) (1998).

■ Because products liability theory considers the relationship of the parties in the stream of commerce, not concepts of transfer and possession, the use of grain bank corn does not prevent recovery. *See* 3 *American Law of Products Liability 3d* § 35:1 (Timothy E. Travers ed. 1987 & Supp.2003). The relevant consideration is whether the defendant is in the business of "selling or otherwise distributing" a product. *Id.*

■ As a manufacturer and supplier, Spex provides animal feed to the Duxburys and others for their use. Spex undertakes this enterprise for its own profit. Accordingly, Spex is engaged in the business of selling or otherwise distributing animal feed. An action for products liability, therefore, is available to the Duxburys.[2]

Again, but for different reasons, the legal effect of the grain bank statutes does not expressly or necessarily preclude a products liability action. *Cf. Ly*, 615 N.W.2d at 314.

## II.

■ Spex next challenges the Duxburys' recovery under the Minnesota Consumer Fraud Act, arguing that the district court's failure to adopt the Jury Instructions Guide special verdict form for consumer fraud actions was reversible error. We review jury instructions for an abuse of discretion. *Hilligoss v. Cargill, Inc.*, 649 N.W.2d 142, 147 (Minn.2002). Fundamental mistakes of law are reversible, but if the instructions fairly and correctly state the applicable law, they will stand. *Id.*

The Jury Instructions Guide special verdict form for consumer fraud, CIVJIG Spec. Verdict Form No. 57.92, has seven questions. 4 *Minnesota Practice*, CIVJIG Spec. Verdict Form No. 57.92 (Supp.2004). The first three questions parse the three elements of consumer fraud. *See id.* The next three questions set out comparative fault. *See id.; cf. Jack Frost, Inc. v. Engineered Bldg. Components Co.*, 304 N.W.2d 346, 352 (Minn.1981). The last question requires the jury to calculate damages. *See* 4 *Minnesota Practice*, CIVJIG Spec. Verdict Form No. 57.92.

■ In lieu of the first three questions, the special verdict form at issue here asked, "Did [Spex] violate the Consumer Fraud Statute as defined in the jury instructions?" The district court has no obligation to adopt the Jury Instructions Guide special verdict form so long as the law is correctly stated. *Cf. N. States Power Co. v. Fidelity & Cas. Co. of New York*, 523 N.W.2d 657, 663 n. 8 (Minn.1994). Spex concedes that the jury instructions correctly stated the law and were in accordance with the Jury Instructions Guide. Thus, this aspect of the special verdict form provides no basis for finding error.

■ The remaining four questions are incorporated in the district court's special verdict form, but Spex argues that the district court should have set out separate comparative fault questions on each theory of liability.[3] Spex claims that separate

2. Spex argues that, because products liability and implied warranty claims "merge" into a single products liability theory, the absence of a sale under the UCC would also bar a products liability claim. As our analysis shows, each of these theories considers the underlying transaction differently. Merger is only available where different claims present similar factual issues. *See Bilotta*, 346 N.W.2d at 622 (allowing merger of negligence with design-defect and failure-to-warn products liability cases because these products liability theories incorporate a negligence standard). Here, because products liability is based on manufacturing flaws and negligence is not incorporated into this theory, it cannot be merged with an implied warranty claim. *See*

Michael J. Steenson, *Comparative Analysis of Minnesota Products Liability Law and the Restatement (Third) of Torts: Products Liability*, 24 Wm. Mitchell L.Rev. 1, 18 (1998); *see also Piotrowski v. Southworth Prods. Corp.*, 15 F.3d 748, 751 (8th Cir.1994).

3. Although Spex summarily argues that the submission of the consumer fraud claim to the jury is erroneous, it does not specifically challenge the damages instruction. At trial, the parties argued whether the Duxburys could seek damages through their consumer fraud action.

The only remedy directly available under the Minnesota Consumer Fraud Act is injunction. Minn.Stat. § 325F.70, subd. 1 (2002).

questions are necessary in order to distinguish the claims on which the jury is assessing comparative fault. But this scheme would expose the district court to inconsistent verdicts. Where different claims present factual issues that are "closely related and involve similar proof," it is permissible to merge these issues in the jury instructions. *In re Shigellosis Litigation,* 647 N.W.2d at 11. Thus, we conclude that the district court's decision to merge redundant factual issues in the special verdict form was not an abuse of discretion.

### III.

Spex argues that the negligence per se instruction based on Minnesota's Commercial Feed Law was erroneously given because, Spex contends, the law does not regulate Spex's conduct and, therefore, does not establish an applicable standard of care. Whether a statute applies to a party's conduct presents an issue of statutory interpretation, which we review de novo. *Brookfield Trade Ctr., Inc. v. County of Ramsey,* 584 N.W.2d 390, 393 (Minn. 1998).

The Minnesota Commercial Feed Law provides in relevant part that "[t]he following acts and causing the following acts in Minnesota are prohibited: (1) manufacture or distribution of any commercial feed that is adulterated or misbranded[.]" Minn. Stat. § 25.38 (2002). "Commercial feed" includes "materials or combinations of materials that are distributed or intended to be distributed for use as feed or for mixing in feed[.]" Minn.Stat. § 25.33, subd. 5 (2002).

The class of actors prohibited from manufacturing or distributing adulterated commercial feed is not limited by Minn.Stat. § 25.38. Nor does the statute require the actor to be a "commercial feeder" or a licensed manufacturer or distributor of feed. It is not disputed that Spex manufactures and sells commercial feed as defined by Minn.Stat. § 25.33, subd. 5. And not one of the statutory exemptions applies here. Accordingly, Spex's claim that the Minnesota Commercial Feed Law does not apply to its conduct is unavailing.

▆▆▆▆ A negligence per se instruction may be given if (1) "the persons harmed by [the] violation [of a statute] are within the intended protection of the statute" and (2) "the harm suffered is of the type the [statute] was intended to prevent." *Alderman's Inc. v. Shanks,* 536 N.W.2d 4, 8 (Minn.1995). The Duxburys operate a hog farm, the Minnesota Commercial Feed Law was enacted to protect farmers from harmful animal feeds, and the harm suffered here was damage from adulterated animal feed. The negligence per se instruction, therefore, was properly given.

### IV.

▆▆▆ The existence of a joint venture is ordinarily an issue of fact. *Am. States Ins. Co. v. Ankrum,* 651 N.W.2d 513, 522

---

But damages and attorney fees may be available through the private attorney general statute, Minn.Stat. § 8.31, subds. 1, 3a (2002). To proceed under this statute, the plaintiff is required to demonstrate that the action benefits the public as a whole, rather than the plaintiff alone. *Ly,* 615 N.W.2d at 312.

After trial, the parties litigated whether the Duxburys' successful consumer fraud claim entitled them to attorney fees under the private attorney general statute. The district court concluded that there was no public interest at stake and held that attorney fees were not available. By the same logic, the Duxburys also would not be entitled to damages from their consumer fraud action. Even if the submission of damages on this theory were a fundamental mistake of law, there was no prejudice to Spex, and the error does not require reversal. *Stelter v. Chiquita Processed Foods, L.L.C.,* 658 N.W.2d 242, 246 (Minn. App.2003).

(Minn.App.2002). But where no competent evidence will support a finding of joint venture, the district court may decide the issue as a matter of law. *See Weber by Sanft v. Goetzke*, 371 N.W.2d 611, 616 (Minn.App.1985), *review denied* (Minn. Sept. 26, 1985). Because the district court ruled as a matter of law that a joint venture did not exist, we review this determination de novo. *Brookfield Trade Ctr., Inc. v. County of Ramsey*, 584 N.W.2d 390, 393 (Minn.1998), *review denied* (Minn. Oct. 9, 1998).

A joint venture exists when two or more persons combine their money, property, time, or skills in a business enterprise and agree to share the resulting profits. *Rehnberg v. Minnesota Homes*, 236 Minn. 230, 234–35, 52 N.W.2d 454, 456–57 (1952). Participants in the venture have an agency relationship, which in part means that they share a duty of disclosure to one another. *See id.* at 236, 52 N.W.2d at 457 (holding that participants' obligations are same as for partnership); *see also Dahl v. Charles Schwab & Co., Inc.*, 545 N.W.2d 918, 925 (Minn.1996) (requiring agents to fully disclose all material facts to the principal).

A joint venture has four elements. First, each party must make a contribution of money, property, time, or skill to the enterprise. *Ankrum*, 651 N.W.2d at 522. Second, the parties must have joint proprietorship and control such that each party has a proprietary interest and the right of mutual control over the enterprise. *Id.* Third, the parties must have an express or implied agreement to share the profits, but

not necessarily the losses, from the enterprise. *Id.* Fourth, the parties must have entered into an express or implied contract. *Id.* The district court's ruling was based on the dearth of evidence as to the third element.[4]

The element of shared profits does not require that participants in an enterprise share equally or that they share in losses. *See Rehnberg*, 236 Minn. at 236, 52 N.W.2d at 457. If the amount that one party receives is fixed, regardless of the success or failure of the enterprise, there is no joint venture. *See Meyers v. Postal Fin. Co.*, 287 N.W.2d 614, 618–19 (Minn. 1979) (finding no joint venture where one party "was to receive fixed payments" according to number of members in buying club, but that party had no right to a share of the other party's profits); *Treichel v. Adams*, 280 Minn. 132, 135–36, 158 N.W.2d 263, 266 (1968) (finding no joint venture where a fixed amount of profits was applied against the debt owed by one party to the other).

Because Shanahan was entitled to only a fixed percentage of the Duxburys' surviving newborn pigs, regardless of whether the Duxburys' hog farm was profitable, there is no factual basis to support a finding that Shanahan was sharing profits with the Duxburys. Accordingly, the district court did not err in withholding the issue from the jury and determining as a matter of law that a joint venture did not exist.

## V.

The availability of prejudgment interest is a legal issue that we review de novo.

---

4. The district court also observed, but did not directly hold, that there was no evidence to support a finding of joint proprietorship and control. Although the Duxburys relied on Shanahan to assist them with animal feed issues, it is undisputed that Shanahan did not assert control over the Duxburys' hog farm or participate in any day-to-day business decisions. Thus, these facts also support a finding that, as a matter of law, there was no joint venture. *See Beehner v. Cragun Corp.*, 636 N.W.2d 821, 832 (Minn.App.2001); *Powell v. Trans Global Tours, Inc.*, 594 N.W.2d 252, 256 (Minn.App.1999).

*Trapp v. Hancuh,* 587 N.W.2d 61, 63 (Minn.App.1998). Prejudgment interest is governed by Minn.Stat. § 549.09 (2002), which provides in relevant part:

> Except as otherwise provided by contract or allowed by law, preverdict, preaward, or prereport interest on pecuniary damages shall be computed [according to an administratively determined interest rate] from the time of the commencement of the action or a demand for arbitration, or the time of a written notice of claim, whichever occurs first, except as provided herein.

Minn.Stat. § 549.09, subd. 1(b) (2002). Prejudgment interest is not available for that portion of a judgment based on interest. *Id.* at 1(b)(5).

▆▆▆▆ The parties argue, in part, that the availability of prejudgment interest depends on the ascertainability of the judgment amount. But a plain reading of the statute indicates that prejudgment interest "shall be computed" regardless of the ascertainability of the judgment. *Skifstrom v. City of Coon Rapids,* 524 N.W.2d 294, 296 (Minn.App.1994), *review granted* (Minn. Feb. 3, 1995), *and appeal dismissed* (Minn. Oct. 25, 1995); *see also Lienhard v. State,* 431 N.W.2d 861, 865 (Minn.1988) (finding in dictum that prejudgment interest is allowed "irrespective of a defendant's ability to ascertain the amount of damages"). The purpose of this statute is to give potential judgment debtors a greater incentive to settle or expedite cases. *See Skifstrom,* 524 N.W.2d at 296; *see also* Patrick C. Diamond, Note, *The Minnesota Prejudgment Interest Amendment,* 69 Minn. L.Rev. 1401, 1408–09 & n. 25 (1985). To properly execute the meaning and purpose of the statute, we hold that prejudgment interest is available notwithstanding ascertainability of the judgment.[5]

Spex next claims that the issue of prejudgment interest was improperly submitted to the jury. The Duxburys respond that interest is properly considered as an element of pecuniary damages and is necessary to reflect interest on "lost profits." As we previously noted, jury instructions are reviewed for abuse of discretion but will be reversed if there is a fundamental

5. Two conflicting lines of authority have arisen in this area. Prior to the amendment of Minn.Stat. § 549.09 in 1984, common law provided that prejudgment interest was available only when the amount of the judgment was ascertainable. *See Summit Court, Inc. v. N. States Power Co.,* 354 N.W.2d 13, 16 n. 1 (Minn.1984). The first case to directly address the effect of the new amendment, *Skifstrom,* held that the ascertainability rule had been superseded and that the statute should be strictly applied. 524 N.W.2d at 296.

Ensuing cases have not uniformly followed *Skifstrom.* The majority of post-*Skifstrom* cases continued to apply the common law ascertainability rule. *See, e.g., Peterson v. BASF Corp.,* 657 N.W.2d 853, 873–74 (Minn. App.2003), *aff'd on other grounds,* 675 N.W.2d 57 (Minn. Feb.19, 2004); *Pine Valley Meats v. Canal Capital Corp.,* 566 N.W.2d 357, 364 (Minn.App.1997), *review denied* (Minn. Sept. 18, 1997). *Wenzel v. Mathies* disregarded *Skifstrom* and expressly rejected the strict application of prejudgment interest under the statute. 542 N.W.2d 634, 644 (Minn.App. 1996), *review denied* (Minn. Mar. 28, 1996). *Trapp* also disregarded *Skifstrom* but attempted to reconcile the statute with the common law rule. 587 N.W.2d at 63. *Trapp* found that, because Minn.Stat. § 549.09 only requires prejudgment interest "[e]xcept as otherwise provided by contract or *allowed by law,*" the provision incorporated the common law ascertainability rule. *Id.* at 63 (emphasis added).

But other cases continue to rely on *Skifstrom. See Myers v. Hearth Techs., Inc.,* 621 N.W.2d 787, 794 (Minn.App.2001), *review denied* (Minn. Mar. 15, 2001); *Cox v. Crown CoCo, Inc.,* 544 N.W.2d 490, 500–01 (Minn. App.1996). *Skifstrom's* interpretation of Minn.Stat. § 549.09 was also recently adopted by the Eighth Circuit. *See Children's Broadcasting Corp. v. Walt Disney Co.,* 357 F.3d 860, 869–70 (8th Cir.2004) (citing *Myers,* 621 N.W.2d at 794).

misstatement of the applicable law. *Hilligoss*, 649 N.W.2d at 147.

■■■■ The arguments as framed by the parties suggest some confusion between prejudgment interest and interest as an element of pecuniary damages. In a warranty action, if a plaintiff is required to take out loans as a result of economic loss, then the interest on those loans is recoverable as an element of pecuniary damages. *Anderson v. Lloyd's Feed Serv.*, 443 N.W.2d 208, 210–11 (Minn.App.1989); *Imdieke v. Blenda–Life, Inc.*, 363 N.W.2d 121, 125–26 (Minn.App.1985), *review denied* (Minn. Apr. 26, 1985). By contrast, prejudgment interest compensates the plaintiff for inflation for the period from the claim to the verdict. It is not based on any loss intrinsic to the plaintiff's claim. *See Lienhard*, 431 N.W.2d at 865 (finding in dictum that prejudgment interest "convert[s] time-of-demand damages into time-of-verdict damages"); *see also* Minn.Stat. § 549.09, subd. 1(c) (basing prejudgment interest on secondary market yield from one-year treasury bills).

The difference between these two forms of interest is implicitly recognized by Minn.Stat. § 549.09. When calculating prejudgment interest, any part of the pecuniary damages based on interest is excluded from the principal amount. Minn.Stat. § 549.09, subd. 1(b)(5). This deduction prevents interest from being awarded twice—once for the interest that accrues from the time of a loan until the verdict and again for the interest that accrues from the time of a claim until the verdict.

■■■■ The Duxburys, in effect, are seeking compensation for the impact of infla-

tion on their prospective profits. But because Minn.Stat. § 549.09 compensates a plaintiff for inflation from the time of the claim, it is not permissible for a plaintiff to seek interest on "lost profits" as an element of pecuniary damages. Otherwise, the plaintiff would collect interest once from the time of the loss and again from the time of the claim. Such a result is exactly what the statute is designed to avoid.

On damages, the district court instructed the jury to calculate "interest from the time at which the value of the property is fixed." This instruction contemplates the effect of inflation on the amount of the loss. But statutory prejudgment interest supplies the proper remedy. Because prejudgment interest is determined as a matter of law and is based on the amount of the verdict, it was reversible error for the district court to submit this issue to the jury.

## VI.

Spex summarily argues that there is insufficient evidence to support the verdicts for warranty, products liability, and consumer fraud.[6] We uphold a district court's decision to deny JNOV when there is competent evidence that reasonably supports the verdict. *Pouliot v. Fitzsimmons*, 582 N.W.2d 221, 224 (Minn.1998). A decision to deny a new trial will stand unless the verdict is "manifestly and palpably contrary to the evidence." *Raze v. Mueller*, 587 N.W.2d 645, 647 (Minn.1999) (quotation omitted). On review, we consider the evidence in the light most favor-

---

**6.** Spex's appeal does not specifically challenge the district court's finding that there is sufficient evidence for the Duxburys' negligence claim. But at oral argument, Spex challenged the sufficiency of evidence for the negligence claim, relying in part on issues first raised in its reply brief. Because this issue has not been squarely presented, it is waived, and we decline to consider it. *See Swarthout v. Mut. Serv. Life Ins. Co.*, 632 N.W.2d 741, 748 (Minn.App.2001).

able to the prevailing party. *Pouliot,* 582 N.W.2d at 224.

■ The elements for a claim of breach of warranty under the UCC are (1) the existence of a warranty; (2) breach of the warranty; and (3) causation of damages. *Peterson v. Bendix Home Sys., Inc.,* 318 N.W.2d 50, 52–53 (Minn.1982). When a seller makes "any affirmation of fact or promise" about a product, an express warranty arises that the product will conform to that promise. Minn.Stat. § 336.2–313(1)(a) (2002). It is not necessary that the promise be characterized as a warranty. *Id.* at § 336.2–313(2) (2002).

■ According to both Shanahan and the Duxburys, representatives of Spex said that quality corn would be used in the feed. Thus, an express warranty arose. *See Yost v. Millhouse,* 373 N.W.2d 826, 829 (Minn.App.1985) (finding sufficient evidence of express warranty where seller makes representation about character of merchandise). The warranty was breached when substandard corn was used to make the feed, and it harmed the Duxburys' sows. The evidence in the record is sufficient to support the jury's verdict on the express warranty claim. *See Heil v. Standard Chem. Mfg. Co.,* 301 Minn. 315, 322–23, 223 N.W.2d 37, 41–42 (1974).

■ An implied warranty of merchantability provides that the product is fit for its ordinary and intended use, Minn.Stat. § 336.2–314(2)(c) (2002). An implied warranty of merchantability arises automatically when the product is a "good" and the seller is in the business of furnishing the product to the consumer. *Id.* at § 336.2–314(1) (2002). A product is a good if it is "movable at the time of identification to the contract for sale." *Id.* at § 336.2–105(1) (2002); *see also TCF Bank & Sav., F.A. v. Marshall Truss Sys., Inc.,* 466 N.W.2d 49, 51–52 (Minn.App.1991) (finding

that, where buyer purchased specially manufactured building trusses for building site, trusses were "goods" for purposes of implied warranty of merchantability), *overruled on other grounds by Lloyd F. Smith Co. v. Den–Tal–Ez, Inc.,* 491 N.W.2d 11 (Minn.1992).

Because Spex is in the business of furnishing animal feed, a movable good, an implied warranty of merchantability arose. The feed, which was not fit for its ordinary and intended use, caused illness to the sows and economic loss to the Duxburys. Thus, we conclude that there also is sufficient evidence to support the jury's verdict on the implied warranty claim. *Cf. Int'l Fin. Servs., Inc. v. Franz,* 534 N.W.2d 261, 266–67 (Minn.1995).

■ The elements of a products liability claim are that (1) a product was in a defective condition unreasonably dangerous for its intended use; (2) the defect existed at the time the product left the defendant's control; and (3) the defect proximately caused the plaintiff's injury. *Bilotta,* 346 N.W.2d at 623 n. 3. When products liability is based on a manufacturing-flaw theory, a product is in a defective condition if the user could not have anticipated the danger that the product poses. *Id.* at 622; *see also* 4A *Minnesota Practice,* CIVJIG § 75.30 (4th ed.1999).

■ The evidence establishes that toxins were in the hog feed when it left Spex's control. The Duxburys could not have anticipated that the hog feed would be dangerous to their gestating sows, and as a result, their sows were injured. Accordingly, there is sufficient evidence to support the jury's verdict on the products liability claim.

In a consumer fraud action, the plaintiff must prove that (1) the defendant used false information or a deceptive practice; (2) the defendant intended that others rely

on the false information or deceptive practice; and (3) the plaintiff's reliance on the false information or deceptive practice harmed the plaintiff. Minn.Stat. § 325F.69, subd. 1; *cf. Church of Nativity of Our Lord v. WatPro, Inc.,* 491 N.W.2d 1, 8 (Minn.1992); 4 *Minnesota Practice,* CIVJIG § 57.40 (Supp.2003).

When viewed in the light most favorable to the verdict, the record demonstrates that, after Spex learned of problems in its storage of grain bank corn, it did not take action to rectify the problem. Rather, Spex continued to tell the Duxburys that feed made from the corn was safe. As a result, the Duxburys continued to use the feed long after their gestating sows began suffering ill effects. Accordingly, there is sufficient evidence in the trial record to support the jury's verdict on the consumer fraud claim.

### DECISION

The district court properly allowed actions for products liability and warranty to proceed, and the jury instructions for negligence, warranty, products liability, and consumer fraud were not erroneous. As the jury's verdicts on these claims are supported by sufficient evidence, we affirm. The district court erred, however, in submitting the issue of prejudgment interest to the jury. Accordingly, we reverse the jury's determination of prejudgment interest and remand for further proceedings to calculate prejudgment interest, pursuant to Minn.Stat. § 549.09, without consideration of lost profits.

**Affirmed in part, reversed in part, and remanded.**