*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0061**

County of Hennepin,
Appellant,

vs.

1010 Metrodome Square, LLC,
Respondent.

**Filed August 25, 2014
Affirmed in part, reversed in part, and remanded
Hudson, Judge**

Hennepin County District Court
File No. 27-CV-12-13364

Michael O. Freeman, Hennepin County Attorney, Jay L. Arneson, Assistant County Attorney, Minneapolis, Minnesota (for appellant)

Daniel N. Rosen, Anthony G. Edwards, Parker Rosen, LLC, Minneapolis, Minnesota (for respondent)

Considered and decided by Hudson, Presiding Judge; Stauber, Judge; and Kirk, Judge.

## UNPUBLISHED OPINION

**HUDSON**, Judge

On appeal in this contract dispute, appellant argues that the district court erred by concluding that (1) the parties had not impliedly extended their contract for chilled water; (2) appellant was unjustly enriched by chilled-water payments made by respondent; and

(3) a contract for steam and chilled water is not governed by the Uniform Commercial Code (UCC). Respondent filed a related appeal arguing that the district court erred in its calculation of preverdict interest. We affirm in part, reverse in part, and remand.

**FACTS**

Appellant Hennepin County owns and operates the Hennepin County Energy Center (HCEC), which distributes steam and chilled water to various downtown Minneapolis buildings for heating and cooling purposes. Respondent 1010 Metrodome Square, LLC (1010), owns the building at 1010 South Seventh Street in Minneapolis. Basant Kharbanda is 1010's president. When 1010 purchased the building in 2000, it was subject to a 20-year contract with HCEC for steam and chilled water that was set to expire on November 18, 2006. In addition, U.S. Bank was leasing the building; U.S. Bank vacated the space by the end of 2005, and thereafter the building's heating demands were minimal and it had no cooling need.

In June 2005, Kharbanda met with Barbara Sutey, HCEC's then director of public works management support. He informed Sutey of the reduced needs of the building and asked that the 1986 steam and chilled-water contract be terminated. The two agreed that the contract would terminate as scheduled on November 18, 2006, and Sutey agreed to send Kharbanda a new contract. Under the new contract, clients were billed separately for a "demand charge" and a "consumption charge" for steam and chilled water. The demand charge guaranteed availability of a certain amount of steam or chilled water while the consumption charge reflected the actual quantity of steam or chilled water delivered to a particular building. It was also possible under the new contract to bill a

2

customer separately for steam or chilled water, depending on the needs of a particular building. Sutey sent Kharbanda a letter summarizing the meeting, confirming that the 1986 contract would expire on November 18, 2006 and stating that "[i]t is the desire of Hennepin County to continue to supply steam and chilled water to you, but under the terms of our standard contract for non-county customers. A draft of that contract will be sent to you for your review." A copy of the new contract was never sent, and Sutey retired shortly thereafter.

Kharbanda met with Sutey's successor, Maurice Gieske, on October 30, 2006. The district court found that Kharbanda again informed HCEC that the 1010 building had greatly reduced steam needs and no further need for chilled water because it was vacant. Kharbanda agreed to a one-year extension of the 1986 contract after Gieske informed him that HCEC would not provide steam to the building beyond November 18, 2006 unless Kharbanda agreed to extend the entire contract. Gieske followed up by sending a letter to Kharbanda summarizing the meeting. The letter stated that the contract extension would terminate on November, 18, 2007, that the steam and chilled-water demand charges were reduced "based on [Kharbanda's] request given the vacant status of the building," and again stating "[i]t is the desire of Hennepin County to continue to supply steam and chilled water to you, but under the terms of our standard contract for non-county customers. Prior to November 18, 2007, a draft of the new contract will be sent to you for your review." Kharbanda testified that Gieske told him that he would send a new contract for steam only. A draft of the new contract was never sent.

Between November 2007 and May 2011 HCEC continued to bill 1010 for steam and chilled water at the rate specified in Gieske's 2006 letter. 1010 paid all the bills, but the building never consumed any chilled water. The district court found that Kharbanda credibly testified that he protested the chilled-water bills several times, the first time after a year-end audit at the end of 2008. Kharbanda testified that Gieske told him he would look into the issue, consult with the legal department, and correct any overpayment that was made. A similar conversation took place after Kharbanda's 2009 year-end audit. Kharbanda testified that throughout 2010 he called HCEC several times to protest the charges, but he was never able to speak with Gieske. Gieske denies that Kharbanda ever disputed the chilled-water bills. Kharbanda chose to stop all payments to HCEC in May 2011 and sent a letter stating: "[a]s you are aware we have been using bare minimum amounts of steam and chilled water for this building on a month to month contract[.] . . . In the past 5 years you have billed us and we have paid over $700,000 in steam costs and over $350,000 for chilled water. I ask you to refund at least the chilled water payments because as we have not used a drop of chilled water in 5 years . . . I have tried to talk to somebody in your office but did not get very far e.g. Julie, Carla, Kathy etc." HCEC continued to bill 1010 for steam and chilled water until March 2012.

HCEC sued 1010, alleging breach of contract, quantum meruit, and promissory estoppel, seeking payment for steam and chilled-water charges from 2011-12. HCEC also sought a declaratory judgment that the 1986 contract was extended by implication from November 18, 2007 through December 31, 2011. The district court concluded that the evidence did not show that the portion of the 1986 contract for chilled water had been

impliedly extended beyond November 18, 2007, and that the quantum meruit and promissory estoppel claims as to the chilled-water payments failed. But the district court concluded that the parties impliedly agreed to a continuation of steam services. The district court found that 1010 owed steam demand and consumption charges from May 2011-March 2012 for a total of $87,093.12.

1010 counterclaimed to recover steam and chilled-water overpayments, which the district court construed as an action for money had and received. The district court concluded that 1010 was not entitled to any refund for steam payments, but that 1010 was entitled to a refund of $226,708 for chilled-water payments because HCEC was unjustly enriched by the payments. HCEC argued that the four-year statute of limitations under the UCC should apply to limit the amount it owed to 1010, but the district court rejected this argument, concluding that the contract for steam and chilled water was one for services rather than goods. The district court, after offset, ordered that HCEC pay 1010 $139,614.88. The district court also awarded preverdict interest to 1010 under Minn. Stat. § 549.09 (2012) in the amount of $5,807.41 dating from the time the counterclaim was served.

HCEC appeals the award of chilled-water payment refunds, arguing that the district court erred by concluding that the parties had not impliedly extended the 1986 contract as to chilled water and by concluding that HCEC was unjustly enriched by 1010's payments. In the alternative, HCEC argues that the district court erred by concluding that the contract for steam and chilled water was a contract for services rather

5

than goods. By notice of related appeal, 1010 argues that the district court erred in its calculation of preverdict interest.

## DECISION

## I

HCEC argues that the district court clearly erred by finding that the parties did not impliedly extend the 1986 contract for chilled water beyond November 18, 2007. In the absence of an express agreement, "the law may imply a contract from the circumstances or acts of the parties." *Bergstedt, Wahlberg, Berquist Assocs., Inc. v. Rothchild*, 302 Minn. 476, 479, 225 N.W.2d 261, 263 (1975). "It is the objective thing, the manifestation of mutual assent, which is essential to the making of a contract." *Id.* "Whether a contract is to be implied in fact is usually a question to be determined by the trier of fact as an inference of facts to be drawn from the conduct and statements of the parties." *Id.* at 479–80, 225 N.W.2d at 263. Because relevant facts are in dispute, we review the district court's findings as to the existence of an implied contract under a clearly erroneous standard. *See* Minn. R. Civ. P. 52.01; *cf. TNT Props., Ltd. v. Tri-Star Developers, LLC*, 677 N.W.2d 94, 101 (Minn. App. 2004) (stating that when the relevant facts are undisputed, the existence of a contract is a question of law reviewed de novo). "Findings of fact are clearly erroneous only . . . if the reviewing court is left with the definite and firm conviction that a mistake has been made." *Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101 (Minn. 1999) (quotation omitted). When determining whether a finding is clearly erroneous, this court views the evidence in the light most favorable to the district court's findings and defers to the district court's opportunity to

6

assess witness credibility. *In re Pamela Andreas Stisser Grantor Trust*, 818 N.W.2d 495, 507 (Minn. 2012).

HCEC argues that the district court erred by finding that the 1986 contract was not impliedly extended as to chilled water because of 1010's actions following the termination date in November 2007: (1) 1010 did not install its own heating or cooling system; (2) 1010 continued to request and receive steam every heating season; (3) 1010 continued to pay steam demand and consumption charges as well as chilled-water demand charges; (4) 1010 marketed the building as having its heating and cooling needs met by HCEC; and (5) 1010 never sent written communication to HCEC protesting the chilled-water bills or expressing a desire to terminate the contract until May 2011. HCEC argues that the only evidence supporting the district court's decision was the "strongly disputed testimony" that Kharbanda made several complaints to Gieske about the chilled-water payments in 2009 and 2010. Notably, HCEC does not seem to dispute the district court's finding that HCEC knew prior to the expiration of the 1986 contract that 1010 did not want or need chilled water based on Kharbanda's face-to-face meetings with Sutey and Gieske.

The district court found that there was no legal requirement that Kharbanda object to the chilled-water bills in writing and gave "no significance" to the fact that 1010 did not install its own heating and cooling operations because it was plausible that 1010 would not make this kind of expenditure when it could not find a tenant for the building. The district court also found, with respect to 1010's marketing materials, that heating and

7

cooling information was just one specification among many in its materials for potential tenants.

HCEC also emphasizes that Kharbanda was not a party to this lawsuit. HCEC claims that the knowledge of Kharbanda's wife, who paid 1010's bills during the pertinent time periods, should be imputed to 1010; thus, the district court ignored the critical fact" that 1010 was at all times aware of what it was paying HCEC. But the district court credited Kharbanda's testimony that he protested the charges and that he reasonably believed he would receive a refund for any overpayment due to the general business practices of HCEC. Kharbanda testified that Gieske told him "if there is a discrepancy [in billing] it'll be definitely fixed. And I believed him because all the Excel Energy and everybody if we overpay they always refund back." Gieske also testified that HCEC's practice is to refund or credit customers when they make an overpayment. Thus, the delay between the dates 1010 made chilled-water payments and the dates Kharbanda protested is not a critical fact because 1010 reasonably believed it would receive a refund of any overpayment.

HCEC also argues that Kharbanda's May 2011 letter, which states "we have been using bare minimum amounts of steam and chilled water for this building on a month to month contract," is proof that the parties had an implied contract. We disagree. The letter contradicts Kharbanda's testimony, which the district court found credible, that he expected to be reimbursed for the chilled-water payments. The 1986 contract provided that the contract would only continue if neither party gave written notice of termination of the contract. That is not what happened here; Gieske signified in writing that HCEC

8

intended to terminate the contract on November 18, 2007. In addition, Gieske testified that HCEC would not have entered into a month-to-month contract because it "would not fit with the way [HCEC] operate[s]."

Finally, HCEC argues that this case is similar to *Bergstedt*, in which the supreme court affirmed the district court's determination that an implied contract existed. 302 Minn. at 481, 225 N.W.2d at 264. In *Bergstedt*, a partnership consulted with an architectural firm to add additional stories to a parking ramp. *Id*. at 477, 225 N.W.2d at 262. Unlike this case, both parties' actions in *Bergstedt* continuously manifested intent for the architecture firm to create plans for the parking garage; the firm was never given a reason to doubt the partnership's understanding of the arrangement. *See id*. Here, the district court credited Kharbanda's testimony that he continuously protested the chilled-water bills. The evidence sufficiently supports the district court's finding that no implied contract for chilled water existed because there was no mutual assent indicating that both parties had a continued desire to be bound by the 1986 contract. *See id.* at 479, 225 N.W.2d at 263.

## II

HCEC argues that the district court erred by concluding that HCEC was unjustly enriched by 1010's chilled-water payments. The district court's equitable determination is reviewed for an abuse of discretion. *See City of N. Oaks v. Sarpal*, 797 N.W.2d 18, 24 (Minn. 2011). This court may reverse the district court's ruling unless it is based on an erroneous view of the law or against the facts in the record. *Id*.

The district court concluded that 1010's counterclaim for a refund of its chilled-water payments constituted "an action for money had and received." An action for money had and received is analogous to one for unjust enrichment. *See Cady v. Bush*, 283 Minn. 105, 110, 166 N.W.2d 358, 361–62 (1969) (stating that "[t]he theory of unjust enrichment or money had and received . . . has been invoked . . . in . . . situations where it would be morally wrong for one party to enrich himself at the expense of another.").

> To establish an unjust enrichment claim, the claimant must show that the defendant has knowingly received or obtained something of value for which the defendant in equity or good conscience should pay. Unjust enrichment claims do not lie simply because one party benefits from the efforts or obligations of others, but instead it must be shown that a party was unjustly enriched in the sense that the term unjustly could mean illegally or unlawfully.

*Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012) (quotation omitted). "Unjust enrichment requires that: (1) a benefit be conferred by the plaintiff on the defendant; (2) the defendant accept the benefit; (3) the defendant retain the benefit although retaining it without payment is inequitable." *Zinter v. Univ. of Minn.*, 799 N.W.2d 243, 247 (Minn. App. 2011). "An action for unjust enrichment may be based on failure of consideration, fraud, mistake, and situations where it would be morally wrong for one party to enrich himself at the expense of another." *Anderson v. DeLisle*, 352 N.W.2d 794, 796 (Minn. App. 1984), *review denied* (Minn. Nov. 8, 1984).

HCEC argues that it was not unjustly enriched by 1010's chilled-water payments because 1010 received "ample consideration for the payments made," as 1010 was able to market its building to tenants as having heating and cooling provided by HCEC. In

addition, HCEC points out that it allocated a fixed amount of chilling capacity to 1010 that it could have marketed to other customers. But the district court credited Kharbanda's testimony that he made it clear 1010 did not need chilled water as early as 2006. Further, HCEC employees twice promised Kharbanda they would send a new contract reflecting the changed needs of the building, but never did so. And after Kharbanda's protests in early 2009-10, HCEC continued to allocate chilled water to 1010 and did not return Kharbanda's calls or attempt to remediate the situation. The district court found that Kharbanda was paying the chilled-water bills under the reasonable impression that he would be refunded for any overpayment based on his understanding of HCEC's normal course of business. We see no abuse of discretion in the district court's determination that 1010 "paid chilled water charges when it had no obligation to do so" and that HCEC "received the money under circumstances in which in equity and good conscience it should pay back to [1010]."

**III**

HCEC argues that the sale of steam and chilled water to 1010 constituted a sale of goods rather than services; therefore, the four-year statute of limitations under Minnesota's version of the UCC would limit 1010's recovery of chilled-water payments to those made after July 24, 2008. *See* Minn. Stat. § 336.2-725 (2012). Whether a transaction is governed by the UCC is a question of law reviewed de novo. *Duxbury v. Spex Feeds, Inc.*, 681 N.W.2d 380, 386 (Minn. App. 2004), *review denied* (Minn. Aug. 25, 2004).

11

Minnesota has adopted the "predominant factor" test to determine whether a contract that involves both services and goods is governed by the UCC. *Valley Farmers' Elevator v. Lindsay Bros. Co.*, 398 N.W.2d 553, 555–56 (Minn. 1987), *overruled on other grounds by Hapka v. Paquin Farms*, 458 N.W.2d 683 (Minn. 1990). If the "substantial or predominant purpose of the contract" is the sale of goods, the transaction is governed by the UCC. *Id.* "'Goods' means all things . . . which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid." Minn. Stat. § 336.2-105 (2012).

Gieske testified that the steam and chilled water leaves HCEC, is circulated out to the 1010 building, and then returns to HCEC; thus, the district court concluded that the contract for steam and chilled water was a contract for services because no title for the steam and chilled water passed between the parties. *See* Minn. Stat. § 336.2-106(1) (2012) (defining "sale" as "the passing of title from the seller to the buyer for a price"). The district court also compared the sale of steam and chilled water to electricity, noting that jurisdictions are split as to whether electricity is a good or a service under the UCC. *See ZumBerge v. N. States Power Co.*, 481 N.W.2d 103, 107–08 (Minn. App. 1992) (noting that "the decision to treat electricity as subject to Article 2 is a legal question as yet unsettled in Minnesota. Other jurisdictions which have considered the issue . . . are not in agreement"), *review denied* (Minn. Apr. 29, 1992).

Here, although the parties' contract was titled "service agreement," HCEC allocated a specific amount of steam and chilled water to 1010, and the amount 1010 actually utilized was measurable. The definition of goods simply requires that the goods

12

be "movable at the time of identification to the contract for sale," and the parties do not dispute that the steam and chilled water was movable in the sense that it travelled between HCEC and 1010. *See* Minn. Stat. § 336.2-105. Accordingly, we reverse the district court and conclude that the original contract between the parties was predominantly for goods. 1010 filed its counterclaim on July 24, 2012. On remand, the district court should recalculate 1010's damages to include only those chilled-water payments made after July 24, 2008, consistent with the four-year statute of limitations under Minn. Stat. § 336.2-725.

## IV

On related appeal, 1010 argues that the district court erred in its calculation of preverdict interest. The availability of preverdict interest is a legal issue reviewed de novo. *Duxbury*, 681 N.W.2d at 390. We affirm the district court's award of preverdict interest under Minn. Stat. § 549.09, but on different grounds. *See Myers v. Price*, 463 N.W.2d 773, 775 (Minn. App. 1990) (stating that an appellate court will affirm judgment if it can be sustained on any grounds), *review denied* (Minn. Feb. 4, 1991). Section 549.09, subdivision 1(b), provides guidelines for calculating preverdict interest and applies in all cases except "as otherwise provided by contract or allowed by law." Since the parties argued this case, this court released *Hogenson v. Hogenson*, which holds that the phrase "as otherwise . . . allowed by law" requires that when a particular claim allows for preverdict interest under common law, interest should be calculated under the common law, rather than section 549.09. *Hogenson v. Hogenson*, ___ N.W.2d ___, 2014 WL 3892109, at *4 (Minn. App. Aug. 11, 2014).

13

Applying *Hogenson* to this case, the question is whether a claim for money had and received, or unjust enrichment, allowed for preverdict interest at common law. Here, 1010 argues that interest on its unjust enrichment claim should be calculated under the common law, which would permit interest calculated from the date each payment for chilled water was made at a rate of 6% under Minn. Stat. § 334.01 (2012). But 1010 conceded at oral argument that it could not identify any case that authorized such a calculation for unjust enrichment claims. Rather, 1010 compares this case to *General Mills, Inc. v. State*, 303 Minn. 66, 226 N.W.2d 296 (1975), arguing that the cases are analogous because both involve government actors. But *General Mills* concerned the narrow "issue of a taxpayer's right to interest on the refund of illegally levied personal property taxes." *Id.* at 67, 226 N.W.2d at 298. Further, in that case the supreme court concluded that interest would accrue from the date the taxpayer demanded a refund, not from the date payments were made; thus, it does not support 1010's proposed calculation. *Id.* at 71, 226 N.W.2d at 300.

Because 1010 has provided no common-law authority for awarding preverdict interest on unjust-enrichment claims, 1010 has not shown that the district court's calculation of interest under Minn. Stat. § 549.09 was incorrect, including the 4% interest rate for awards against government entities. *See Hogenson*, 2014 WL 3892109, at *4-*5 (concluding that, when preverdict interest for a claim was not provided for under common law, it should be calculated under Minn. Stat. § 549.09); Minn. Stat. § 549.09, subd. 1(c)(1) (noting interest rate applicable on certain judgments against the state or its political subdivision). However, on remand, the preverdict interest on the unjust-

14

enrichment claim should be recalculated in accordance with the reduced amount of damages under the four-year statute of limitations discussed above.

**Affirmed in part, reversed in part, and remanded.**