Jeffrey A.Z. HILLIGOSS, Respondent,

v.

CARGILL, INCORPORATED, et al., Petitioners, Appellants.

Nos. C4–01–632, C6–01–227.

Supreme Court of Minnesota.

Aug. 1, 2002.

Dorsey & Whitney LLP, George G. Eck, David J. Lauth, Holly S.A. Eng, Minneapolis, MN, for appellant.

Sprenger & Lang PLLC, Lawrence P. Schaefer, Sara L. Madsen, Minneapolis, MN, for respondent.

## OPINION

STRINGER, Justice.

Jeffrey A.Z. Hilligoss (respondent), a former employee of appellant Cargill Financial Services Corporation (CFSC),[1] was terminated in September 1997 based on Cargill's determination that he was responsible for significant investment losses to the company and that he failed to meet performance expectations. Respondent sued Cargill seeking, among other things, the unpaid portion of his 1996 deferred bonus payment which Cargill claimed was forfeited because respondent was terminated for cause. Following a six-day trial, a jury found that Cargill did not have cause to terminate respondent. The court entered judgment in favor of respondent for $506,956.22, and Cargill's motion for judgment notwithstanding the verdict was denied. The court of appeals affirmed, rejecting claims of error in jury instructions and evidentiary rulings, but remanded for clarification the issue of the damage amount. We affirm.

Respondent became an employee of Cargill in July 1991 as a Trader/Analyst in Cargill's Corporate Capital Group (CCG),[2] focusing on finding, analyzing and developing investment opportunities for Cargill. Respondent received generally favorable performance ratings in 1992 and was pro-

1. CFSC is also known as the Financial Markets Group or Division and is a wholly owned subsidiary of appellant Cargill, Incorporated, a privately held corporation headquartered in Wayzata, Minnesota. Appellants will be referred to collectively as "Cargill."

2. According to trial testimony, this group has also been known as the Special Products Group and the Structured Finance Group.

moted to the position of assistant vice president of CFSC in 1993, and then to vice president two years later.

In 1994, Cargill learned of an investment opportunity with Granite Financial (Granite), a consumer finance company involved primarily in the subprime automobile loan market, a segment of automobile financing focused on sales to high credit risk automobile purchasers. After initial due diligence was completed by respondent and his colleagues, respondent recommended that Cargill invest in Granite and reportedly indicated to management that a worst-case scenario would be a loss in the range of $5–10 million. The investment was made and was initially profitable. In hindsight however, Cargill contends that these "profits" were illusory because, among other things, they included $2.9 million in fees that were supposed to be paid to Cargill by Granite but in fact never were paid. Nevertheless, respondent earned a bonus of $130,000 in 1995, and in 1996, respondent's bonus increased to $900,000. In addition, he was awarded an option to purchase 1000 shares of Cargill stock. Under Cargill's Annual Discretionary Bonus Outline ("Bonus Plan"), one-half of respondent's 1996 bonus was deferred to be paid in equal amounts over the next several years.

It became apparent in 1996 that there were problems with the Granite investment, and Cargill claims respondent should have recommended a reserve be taken against losses in that year.[3] A reserve of $43 million was taken in 1997 and shortly thereafter, Cargill formed a new subsidiary called Maxim Financial Services Corporation (Maxim) to foreclose on its interest in Granite. Respondent was appointed Maxim's President and CEO and given the responsibility for trying to stop the losses and to turn the investment around.

In April 1997 respondent was provided with a list of performance objectives known as Key Results Areas (KRAs) including: "Be present in Milwaukee at least 3 days per week thru mid December 97" and "Assure highest quality servicing of the Granite portfolio; no additional writeoffs." Respondent recalls discussing these goals with the new head of CCG, explaining that he would do the best he could but that this amount of travel might interfere with his childcare obligations and that ensuring "no additional writeoffs" was problematic given the uncertain performance capability of the Granite portfolio.

In a later meeting with a superior in June 1997 respondent acknowledged that he received some "constructive criticism" regarding the Granite investment—specifically that he had "missed the downside analysis" and may have over-delegated to his subordinates. No threat of job security was suggested at this meeting however, nor did he believe he was being held individually responsible for the Maxim or Granite losses. There was no discussion of the amount of time respondent was or was not spending in Milwaukee, and respondent felt the tone of the review was generally positive. Cargill characterized the meeting quite differently however, indicating that it was "inconceivable" that respondent could have left believing his Cargill future was secure.

In any event, at the end of June 1997 respondent received his first yearly installment of the deferred bonus from the 1996 award and was later granted a stock option accompanied by a letter from Cargill's

---

**3.** Cargill notes that respondent's 1996 bonus would have been much less if the reserve had been taken in that year.

chairman and CEO stating that the grant "recognizes [respondent's] contribution to Cargill's success and [Cargill's] expectation of the important role [respondent] will play in Cargill's future."

Cargill informed respondent on September 25, 1997, that his employment was being terminated, an announcement that he testified left him "stunned." He claims he was given no warning nor was he provided an opportunity to respond to the reasons for his termination as cited by upper management, a step referenced in Cargill's policies and procedures for terminating employees for cause.

Several reasons were given for the termination including the substantial losses Cargill experienced as a result of the Granite/Maxim investment, respondent's lack of leadership evidenced by a trip to Hawaii and upcoming trip to Bermuda[4] at a time when Granite was experiencing serious problems, failure to follow instructions to be in Milwaukee at least three days per week, and engaging in conduct that created a conflict of interest based on communications respondent was having with an outside entity regarding the potential sale of Maxim. A subsequent letter from Cargill's legal counsel reiterated Cargill's reasons for the termination and also indicated that because respondent was terminated for cause, his right to the remaining $337,000 unpaid portion of his 1996 deferred bonus under the terms of the Bonus Plan was forfeited.[5]

Following his Cargill termination respondent did some consulting work, and then in February 1998 he accepted a position as Chief Financial Officer of Freedom Nation, Inc. (formerly known as Emerald First Financial), a company engaged in the business of processing and servicing loans for purchasers of recreational products such as boats and recreational vehicles. Cargill claims respondent's employment with Freedom Nation constituted employment with a competitor and was an independent basis for forfeiture of the deferred portion of his 1996 bonus. Respondent was competing, so Cargill claims, because of the similarity between the recreational vehicle loan business and the sub-prime automobile loan business, and because he hired some employees away from Cargill to work for him at Freedom Nation.

Respondent sued Cargill asserting eight separate claims seeking compensatory and punitive damages, among other things. In addition to raising several defenses, Cargill filed a counterclaim against respondent

---

4. According to respondent, the purpose of these trips was to attend conferences where he was a featured speaker.

5. As to termination, the Bonus Plan states:

Termination for cause or continuance of a career within the financial industry outside of Cargill will result in forfeiture of the deferral portion of the bonus which has not been paid out. *Continuance of a career within the financial industry is defined as employment by, consulting with, establishing or a substantial ownership interest in any organization which competes with FMG for employees, customers, clients, market share, financial resources or deals.*

The deferred incentive payment will not be forfeited under the following circumstances:

√ If an employee is terminated through no fault or impetus of his own due to a RIF, or job elimination;

√ An employee voluntarily terminates employment and does not compete with FMG;

√ Retirement, disability leave or death.

Payout of the deferral portion of the bonus will occur after a two year non-compete agreement has been observed. After termination, deferral accounts will not be paid until said two year period expires and will grow at Cargill's corporate-wide return on investment as determined from year to year.

alleging fraud and misrepresentation claiming respondent failed to sufficiently advise Cargill of the risks associated with the Granite investment and failed to take appropriate reserves to protect Cargill. Five of respondent's eight claims were later withdrawn, and on cross-motions for summary judgment, the court ruled that Cargill had failed to demonstrate that respondent's post-termination employment contravened the noncompete provision of the Bonus Plan, and that the language of the provision was overly broad. The district court also dismissed Cargill's counterclaim and respondent's remaining claims, leaving only the breach of contract claim for adjudication.

Following opening arguments at trial, the court ruled that evidence of respondent competing with Cargill would not be admissible, a reversal of an earlier ruling admitting evidence of competition on the basis that it was a question of fact for the jury.[6]

At the close of the trial, the jury was instructed on a number of points relevant to the breach of contract issue, including the definition of termination for cause:

> The term "cause" generally means a real cause or basis for dismissal as distinguished from an arbitrary whim or caprice. That is, some cause or ground that a reasonable employer, acting in good faith in similar circumstances would regard as a good and sufficient basis for terminating the services of an employee. A termination is for cause if Plaintiff breached the—the standards of job performance that the Defendant es-

tablished and uniformly applied. It is up to you to decide whether Jeffrey Hilligoss' employment with Cargill was terminated for cause.

Cargill objected to the language "standards of job performance that the Defendant established and uniformly applied," on the basis that it was appropriate for labor law cases but not here because it could require Cargill to prove through individual employee records the uniformity of application.[7]

The jury returned a special verdict in favor of respondent concluding that he had proved by a preponderance of the evidence that Cargill did not have cause to terminate his employment. Cargill's post-trial motion for JNOV or alternatively a new trial was denied and judgment was entered awarding respondent a stipulated damage amount of $506,956.22.

On Cargill's appeal to the court of appeals, it argued that a new trial was required for several reasons, among them that the district court erred in its instructions to the jury as to "for cause" termination and by excluding evidence that respondent competed against Cargill after his termination. The court of appeals affirmed on both grounds. The court concluded that the district court acted within its discretion in charging the jury on "for cause" noting that the portion of the instruction challenged by Cargill came directly from CIVJIG 55.50, the civil jury instruction on termination for "good cause," and that "good cause" was inter-

---

**6.** Cargill claims that the timing of the district court's ruling was particularly prejudicial because it addressed the issue of competition in its opening statement and then was deprived of the opportunity to support it with evidence. The district court recognized this at the time of its ruling and indicated that it would give an instruction to the jury on this point if

Cargill deemed it was necessary. Apparently no instruction was requested.

**7.** This language is taken nearly verbatim from 4 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Civil,* CIVJIG 55.50 (4th ed.1999).

changeable with "cause" in the context of employment terminations.

■ The court further concluded that evidence as to whether respondent competed with Cargill was irrelevant because Cargill had already declared in 1997 that it was withholding respondent's unpaid bonus because he was terminated for cause, not because he competed with Cargill. The court further noted that there was evidence Cargill interpreted its Bonus Plan to limit the noncompete restriction to instances where the employee voluntarily resigned. The court also determined that the district court did not err in finding the noncompete restriction overly broad, nor did it abuse its discretion by declining to apply the blue-pencil doctrine.[8] The court affirmed the district court order dismissing the parties' claims on summary judgment but remanded for clarification the issue whether the damage award included unexercised stock options. We granted review on two issues: whether the "for cause" jury instruction was error and whether the district court erred in excluding evidence of competition.

## I.

■ The district court has broad discretion in determining jury instructions and we will not reverse in the absence of abuse of discretion. *See State Farm Fire & Cas. Co. v. Short,* 459 N.W.2d 111, 113 (Minn.1990); *Alholm v. Wilt,* 394 N.W.2d 488, 490 (Minn.1986). An instruction that is so misleading that it renders incorrect the instruction as a whole will be reversible error, but "a jury instruction may not be attacked successfully by lifting a single sentence or word from its context." *Lindstrom v. Yellow Taxi Co.,* 298 Minn. 224, 229, 214 N.W.2d 672, 676 (1974). Where instructions overall fairly and correctly state the applicable law, appellant is not entitled to a new trial. *Kohoutek v. Hafner,* 383 N.W.2d 295, 300 (Minn.1986).

■ Cargill argues that the Bonus Plan sufficiently defines termination for cause and that the district court erred by substituting "good cause" in CIVJIG 55.50 for the term "cause" in the Bonus Plan, focusing specific criticism on the "uniformly applied" language found in the instruction. Cargill further argues that the word "cause" in its Bonus Plan is not interchangeable with the heightened standard of "good cause" or "just cause" traditionally found in the labor context. Rather, Cargill argues, termination "for cause" under its Bonus Plan, resulting in forfeiture of the unpaid portion of an employee's deferred bonus, is, by implication, termination for any reason other than those *not* resulting in forfeiture. Cargill thus contends that its Bonus Plan defines "cause" by expressly stating what it is not—that is, termination "through no fault or impetus of [an employee's] own due to a RIF, or job elimination," and "[r]etirement, disability leave or death"—and emphasizes that the court was obligated to respect this definition. The termination of respondent was for cause, Cargill argues, because his job performance was insufficient to warrant further employment.

Respondent argues that the instruction correctly stated the law and that even if the instruction was erroneous, Cargill was not prejudiced. Respondent contends that

8. Cargill argued to the district court that if the noncompete language in the Bonus Plan was overly broad, it should employ the "blue-pencil doctrine." This doctrine, which has been adopted in Minnesota, allows a court at its discretion to modify unreasonable restrictions on competition in employment agreements by enforcing them to the extent reasonable. *See Davies & Davies Agency, Inc. v. Davies,* 298 N.W.2d 127, 131 n. 1 (Minn. 1980).

the Bonus Plan did not define termination for cause, and that Cargill's attempt to differentiate "termination for cause" from "termination for good cause" is mere word-games. In any event, respondent asserts, in challenging only a portion of the jury instruction, Cargill ignores the applicable standard of review requiring jury instructions to be reviewed as a whole to determine whether the instruction constitutes reversible error, and that here the instruction, taken as a whole, correctly stated the law as to respondent's breach of contract claim.

■ A fundamental principle of contract law is that when contract language is reasonably susceptible of more than one interpretation it is ambiguous, and ambiguous contract terms must be construed against the drafter—here, Cargill. *Current Tech. Concepts, Inc. v. Irie Enter., Inc.*, 530 N.W.2d 539, 543 (Minn.1995); *Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 66 (Minn.1979). The Bonus Plan at issue here is, at best, ambiguous as to whether termination by RIF, job elimination, retirement, disability, or death are merely examples of when a deferred bonus will not be forfeited, or whether they constitute an exhaustive list and termination for any other reason is for cause, as Cargill argues. The Bonus Plan does not clearly define termination for cause, and considering the wide variety of reasons why employment might be terminated, to define "for cause" as any termination not fitting into one of the narrow categories prominently lacks specificity, particularly when forfeiture of an earned bonus is at stake.

In the absence of a clear definition of termination for cause in the Bonus Plan, the district court did not abuse its discretion in instructing the jury on CIVJIG 55.50. The court considered and ultimately incorporated elements of the instructions proposed by both parties. The first

portion of Cargill's requested instruction was given word-for-word, defining "cause" as "a real cause or basis for dismissal as distinguished from an arbitrary whim or caprice; that is, some cause or ground that a reasonable employer, acting in good faith in similar circumstances would regard as a good and sufficient basis for terminating the services of an employee." The instruction Cargill claims was error was what followed: "A termination is for cause if Plaintiff breached the standards of job performance that the Defendant established and uniformly applied."

We fail to see how the instructions Cargill requested differ, in any significant manner, from those it now challenges. Termination for cause where the employee fails to meet a performance standard uniformly applied by the employer incorporates the same notion of even-handed consistency as does Cargill's requested instruction that termination is for cause where it is not based on arbitrary whim or caprice. Nor is it substantially different from the proposition that termination for cause is termination based on grounds that a reasonable employer acting in good faith would find to be good and sufficient. Accordingly, evaluating the district court's instruction as a whole, we conclude that the court's instructions did not constitute error, and we further conclude that the court of appeals did not err in ruling that in the context of employment terminations, "good cause," "just cause," and "cause" are interchangeable, and none carries any higher level of proof than another. *See Black's Law Dictionary* 213 (7th ed.1999) (defining "cause"). We affirm the court of appeals decision on this issue.

As to Cargill's contention that the "uniformly applied" language misstated the law in the context of respondent's claim, it is true that his claim is not based on

discriminate enforcement of the forfeiture provision, but that is not the point. The "uniformly applied" language relates not to respondent's claim, but rather to the enforceability of standards of employment that are not uniformly applied. In any event, we do not believe the "uniformly applied" language necessarily requires a burdensome review of Cargill's employment files and termination records, as Cargill contends. Evidence of uniform application of standards could, for instance, be addressed by reference to a company's manuals and published guidelines and testimony that they are uniformly enforced. We affirm the court of appeals on this issue.

## II.

 Cargill also contends that the district court erred in excluding evidence of post-termination competition by respondent. We again turn to the well-established principle of contract law requiring ambiguities be interpreted against the drafter. *Turner*, 276 N.W.2d at 66. The Bonus Plan states:

> "Termination for cause *or* continuance of a career within the financial industry outside of Cargill [i.e., competing with Cargill as defined in the Bonus Plan] will result in forfeiture of the deferral portion of the bonus which has not been paid out."

(emphasis added). Since "or" may denote that one of two or more alternatives will apply to the exclusion of the other, this provision could be understood to mean that the noncompete restriction applies only where termination is voluntary, or at least not "for cause." This interpretation is consistent with the next paragraph of the Bonus Plan which lists, as one of three circumstances not triggering forfeiture of deferred incentive payments: "An employee voluntarily terminates employment and does not compete with [Cargill]." Read obversely, if the employee does not voluntarily terminate, i.e., he is terminated for cause, then the noncompete restriction does not apply. In any event, the ambiguity in the plan is to be resolved against Cargill, there is no dispute that respondent's termination was not voluntary, and when Cargill informed respondent that he was not entitled to the unpaid portion of his 1996 deferred bonus as a result of his termination for cause, whether respondent competed with Cargill following his termination became irrelevant. We affirm the court of appeals in its ruling that the district court did not err in excluding evidence of respondent's post-termination competition.

Affirmed.

GILBERT, J., took no part in the consideration or decision of this case.