*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0729**

Mark Lanterman, et al.,
Appellants,

vs.

Michael Roman Afremov,
Respondent.

**Filed April 18, 2016
Reversed and remanded
Kirk, Judge**

Hennepin County District Court
File No. 27-CV-12-22089

Eric J. Magnuson, Christopher W. Madel, Benjamin D. Steinberg, Robins Kaplan LLP, Minneapolis, Minnesota; and

K. Jon Breyer, Christopher D. Pham, Lindquist & Vennum LLP, Minneapolis, Minnesota (for appellants)

William R. Skolnick, Andrew H. Bardwell, Skolnick & Joyce, P.A., Minneapolis, Minnesota (for respondent)

Considered and decided by Peterson, Presiding Judge; Kirk, Judge; and Jesson, Judge.

**U N P U B L I S H E D   O P I N I O N**

**KIRK**, Judge

Appellants Mark Lanterman and Computer Forensic Services, Inc. (CFS) sought

payment from respondent and cross-appellant Michael Roman Afremov for costs incurred

in analyzing AGA Medical Corporation data in preparation for Afremov's criminal lawsuit. Following separate jury and bench trials, Lanterman and CFS argue that the district court erred by: (1) granting Afremov judgment as a matter of law (JMOL) on their breach-of-contract claim; (2) providing the jury erroneous instructions on the breach-of-contract claim; and (3) limiting its recovery of unjust-enrichment damages. Afremov argues that the district court erred in awarding any damages to CFS for unjust enrichment. Because the record contains sufficient evidence to support the jury's finding of a contract and the district court erred in defining "costs" in the jury instructions and during deliberations, we reverse and remand to the district court for proceedings consistent with this opinion.

**FACTS**

Lanterman, a computer forensic analyst, is the founder and CEO of CFS. In 2002, Afremov initiated a shareholder lawsuit against AGA Medical Corporation. The district court appointed a receiver for AGA. The receiver hired Lanterman and Espiria Computer Consulting to collect, search, and deliver electronic files stored on various platforms and to retain custody of AGA's electronic data. Lanterman worked on the case as an employee of Espiria. Lanterman later left Espiria and found his own firm, CFS, and transferred the AGA job to CFS. Lanterman produced the requested electronic documents and submitted billing invoices to the receiver reflecting standard business rates. The district court reviewed and approved CFS's billing invoices, which were paid in full by AGA.

In the fall of 2005, AGA and Afremov settled the shareholder lawsuit. In October, the district court entered an order discharging the receiver and outlining how the parties could continue to access the AGA data.

> Bassford, Remele ([AGA] litigation counsel) shall retain and store [AGA's] litigation files relating to this action for a period of six years, allowing [AGA] and Mr. Afremov access to such files . . . . The costs resulting from the Bassford, Remele custody and administration of the files and the access process, are properly payable by Plaintiff Afremov, except that [AGA] should pay all costs associated with identification and segregation of the Protected Items and the costs associated with its own access to such files.

In June 2006, Afremov was indicted in federal court on criminal charges. In April 2007, Frank Berman, Afremov's local attorney, contacted Lanterman and told him that he wanted to review the AGA documents. On April 18, Joseph Petrosinelli, one of Afremov's attorneys based in Washington D.C., sent a letter to Lanterman informing him that Afremov would be subpoenaing documents from the 2005 shareholder lawsuit in advance of his criminal trial, which was slated to begin in September 2007. In the letter, Petrosinelli wrote:

> We represent Michael Afremov in connection with the above-captioned criminal case [*United States v. Afremov*], now pending in federal court in Minneapolis. We understand that some time ago, in your capacity as an expert consultant to the [r]eceiver of AGA Medical Corporation, you and/or your company took custody of certain AGA documents, including electronic files. We believe those documents contain information that is relevant to our defense of Mr. Afremov in the criminal case, and at the appropriate time we intend to serve subpoenas on you and your company calling for production of the documents to us. Thus, we request that you preserve such documents in your possession, and that you conduct whatever compilation and review of the documents that you believe is necessary in advance of production to us. For your information, the trial is currently scheduled for September 10, 2007, and we intend to serve our subpoenas well in advance of that date.

We note that on October 24, 2005 the trial court in [the shareholder lawsuit] entered an [o]rder concerning discharge of the [r]eceiver, Mr. Afremov's right to continued access to AGA's litigation files, and other matters. *Pursuant to that [o]rder, Mr. Afremov will pay any costs, including reasonable attorney's fees, that you incur in connection with responding to this request and the forthcoming subpoenas.* Please send all bills for such costs to my attention at the above address. If you have any questions, please feel free to contact me at the above number.

(Emphasis added.) Lanterman testified that, upon receiving the letter, he believed Afremov was offering to hire him to perform computer-forensic analysis of the AGA data. The following day, Afremov served Lanterman the subpoena, commanding him to appear in federal district court on September 10, 2007, and to bring with him:

1. All documents, including all electronic files or data, obtained from AGA Medical Corporation or any of AGA's officers, directors, owners, employees, attorneys, or receivers.

2. All documents, including all electronic files or data, that refer, relate, or pertain to Franck Gougeon, Kurt Amplatz, Michael Afremov, AGA Medical Corporation, Frederick Fischer, or Foremost Machining Company.

3. All electronic mail created or received by Franck Gougeon, Kurt Amplatz, Michael Afremov, or any officer, director, or employee of AGA Medical Corporation.

CFS hired Scott Harris, an attorney employed at Leonard, Street, & Deinard, P.A., to review and segregate AGA's privileged documents. A short time after receiving the letter and subpoena, Lanterman, Berman, and Harris worked together to create a list of search terms for production of AGA documents. Lanterman and CFS immediately began compiling and reviewing the documents, which they sent to Harris for the privilege review.

4

After Harris completed the privilege review, the documents were provided to Afremov's criminal defense team. On June 15, CFS issued its first billing invoice to Afremov totaling $674,861.08, which was composed of $628,737.33 for CFS's computer-forensic services, and $46,123.75 in attorney fees. Afremov paid the attorney fees, but refused to pay the remaining balance. Shortly after CFS issued the first billing invoice, Berman directed CFS to immediately stop working on the project.

In October 2007, Petrosinelli sent Harris a letter, stating that Afremov viewed Lanterman as a fact witness, not as an expert computer-forensic consultant, and offered to pay the "actual, reasonable, out-of-pocket costs" that CFS incurred for the work. Lanterman declined this offer.

In May 2008, CFS sent a second billing invoice to Afremov totaling $178,850.00 for data searches allegedly performed, but not billed before it received the work-stop order. Afremov never received the work product reflected in the second billing invoice, and he refused to pay the invoice.

Afremov pleaded guilty to three tax charges and one conspiracy charge. Lanterman and CFS sought compensation for their unpaid billing invoices in federal court. Although Lanterman and CFS did not provide additional discovery to document their fees, the federal district court ordered Afremov to pay the first billing invoice, but not the second billing invoice. *United States v. Afremov*, No. 06-196(1) (JRT/SRN), 2009 WL 3164739, at *6-8 (D. Minn. Sept. 28, 2009), *vacated*, 611 F.3d 970 (8th Cir. 2010). The federal district court's order was later vacated by the Eighth Circuit Court of Appeals for lack of jurisdiction. *See United States v. Afremov*, 611 F.3d at 978.

5

In October 2012, Lanterman and CFS sued Afremov in state court, asserting claims of breach of contract, promissory estoppel, and unjust enrichment. In February 2014, the district court held a six-day jury trial. At trial, Lanterman testified extensively and was cross-examined about the methods CFS employed to compile and review the AGA data. He also testified about his fees, which included computer-analyst time, flat-rate fees, and computer run-time. Lanterman explained that he charged the computer run-time fee when a computer was used to generate a searchable index of an electronic dataset. During that time, the computer could not be used for other work projects.

At the close of Lanterman and CFS's presentation of their case, Afremov moved for JMOL, arguing in part that CFS failed to prove its breach-of-contract claim. The district court denied the motion, stating that it would rehear the issue at the close of the case.

When both sides had rested, the district court provided the jury with detailed instructions defining a contract. Another section, entitled "Damages," stated the following:

> In answering special verdict question 4, you are to determine the amount of money that will fairly and adequately compensate Computer Forensic Services for damages caused by the breach of contract.
>
> The damages award, if any, should put Computer Forensic Services in the position it would have been in, if the contract had not been breached by Michael Afremov.
>
> Specifically, in this case, to the extent that you find that paragraph 5 of pages 8-9 of the Discharge Order (Exhibit 3) covers Computer Forensic Services, *the word "costs" means a reasonable hourly rate for the people who did any work that Plaintiff has proven was performed*. A party seeking damages must prove the nature and extent of their damages.

You must not decide damages based on speculation or guess.

(Emphasis added.) The district court limited "costs" to the reasonable hourly rate of CFS employees against the wishes of both parties.

The district court provided the jury with a special verdict form directing it to determine whether a contract existed between CFS and Afremov. During deliberations, the jury sent the district court the following question:

> Re: Question pertaining to Judge's Instruction (p. 8: Damages: ¶ 3)
>
> Do damages of the plaintiff as described in costs include only the "reasonable hourly rate for the people" or can it include flat rate fees and computer run time?

The district court responded:

> The word "cost" as described in the jury instruction in question does not include any flat rate fees and computer run time.
>
> Nov. 11, 2014 12:10 p.m.

As deliberations continued, the jury posed another question to the district court:

> The jury is in agreement that the discharge order (pp8-9:¶5) does cover CFS.
>
> In order for the jury to [] put [CFS] in the position it would have been, if the contract had not been breached, the jury believes that the damages include all line items in the invoice (6/15/2007) minus legal fees of $46,123.75.
>
> Is the jury's position [in] violation of your instructions (p8¶3) and your initial clarification (Question 2@12:10?)

The district court responded, "Yes, it would violate the instructions." The jury returned a special verdict finding that there was a contract between Afremov and CFS, that Afremov

7

breached the contract, and that the breach directly caused damage to CFS. It awarded CFS $104,568.75 in damages.

In March, the district court granted Afremov's motion for JMOL on the breach-of-contract claim, concluding that there was no agreement between the parties concerning the scope and nature of the work to be performed and the terms of compensation. Following a bench trial on Lanterman and CFS's promissory estoppel and unjust-enrichment claims, the district court concluded that they failed to prove promissory estoppel because they provided no evidence of the costs incurred in working on the Afremov project.

The district court awarded CFS $103,012.33 on its unjust-enrichment claim related to the first billing invoice because Afremov "obtained some benefit from CFS's production of AGA's documents." The district court found that this balance "best reflect[ed] the value of the services that were provided."

Lanterman and CFS moved for a new trial and both parties moved for amended findings. While the motions were pending, the parties filed a joint motion for dismissal and vacatur on the ground that they had reached an agreement that disposed of the issues raised in the litigation. But the district court denied all of the parties' posttrial motions, including the motion for dismissal and vacatur.

The parties appeal.

## D E C I S I O N

**I.      The district court erred in granting JMOL on CFS's breach-of-contract claim.**

We review a district court's decision to grant JMOL de novo. *See Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919 (Minn. 2009).

8

> [JMOL] should be granted: only in those unequivocal cases where (1) in the light of the evidence as a whole, it would clearly be the duty of the [district] court to set aside a contrary verdict as being manifestly against the entire evidence, or where (2) it would be contrary to the law applicable to the case.

*Jerry's Enters., Inc., v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 711 N.W.2d 811, 816 (Minn. 2006) (quotation omitted). "Courts must view the evidence in the light most favorable to the nonmoving party." *Longbehn v. Schoenrock*, 727 N.W.2d 153, 159 (Minn. App. 2007) (quotation omitted). "JMOL is appropriate when a jury verdict has no reasonable support in fact or is contrary to law." *Id.* In deciding a motion for JMOL, the district court must not "weigh the evidence or judge the credibility of the witnesses." *Lamb v. Jordan*, 333 N.W.2d 852, 855 (Minn. 1983).

CFS argues that the district court improperly granted JMOL because there was substantial evidence in the record supporting the jury's finding of a contract between the parties. We agree.

To prove a breach-of-contract claim, a plaintiff must establish: "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014) (quotation omitted). The formation of a contract requires mutual assent of the parties involved in the transaction. *SCI Minn. Funeral Servs., Inc. v. Washburn-McReavy Funeral Corp.*, 795 N.W.2d 855, 864 (Minn. 2011). "Whether mutual assent exists is tested under an objective standard." *Id.*; *see also Cederstrand v. Lutheran Bhd.*, 263 Minn. 520, 532, 117 N.W.2d

9

213, 221 (1962) (explaining that "[e]xpressions of mutual assent, by words or conduct, must be judged objectively, not subjectively.").

"Generally, the existence of a contract, as well as the terms of that contract, are questions of fact to be determined by the fact-finder." *TNT Props., Ltd. v. Tri-Star Developers LLC*, 677 N.W.2d 94, 101 (Minn. App. 2004). After reviewing the evidence in the light most favorable to CFS, we conclude that there is sufficient evidence to support the jury's finding of a contract. The April 18, 2007 letter from Petrosinelli to Lanterman requested that Lanterman use his discretion in "compil[ing] and review[ing]" AGA documents in preparation for Afremov's criminal trial, and specifically referenced his role "as an expert consultant" to the receiver of AGA medical corporation during Afremov's 2005 shareholder lawsuit. Berman testified that he was aware of the computer-forensic analysis that Lanterman and CFS had performed during the 2005 shareholder lawsuit. Berman also testified that he knew the scope of the AGA data encompassed as many as a million documents.

According to Lanterman, shortly after receiving the letter from Petrosinelli and the subpoena, he discussed the AGA data with Berman and Harris. Berman told him to work quickly in reviewing the AGA documents, and "to leave no stone unturned." Berman also suggested some search terms to narrow the scope of production. These facts demonstrate that there was a "meeting of the minds" between the parties concerning the scope of the work to be performed. A meeting of the minds "may be based on objective manifestations whereby one party by his words or by his conduct, or by both, leads the other party reasonably to assume that he assents to and accepts the terms of the other's offer."

*W. Insulation Servs., Inc., v. Cent. Nat'l Ins. Co. of Omaha*, 460 N.W.2d 355, 358 (Minn. App. 1990) (quotation omitted). While the parties never formalized their agreement in a written contract, the evidence demonstrates that Afremov, through his attorneys' words and conduct, hired Lanterman to perform computer-forensic services in anticipation of Afremov's criminal trial.

The district court reasoned that there was no meeting of the minds concerning the scope of the project because the parties did not know that the AGA data was not in a searchable format and would have to be recreated at great cost. The district court cited Lanterman's testimony that he initially thought that the data was readily searchable because it was on the production server, but was surprised to learn, after engaging with Berman and Petrosinelli, that it had been removed. Upon learning this fact, Lanterman never advised Afremov or his counsel that the AGA data needed to be regenerated into a searchable format at a cost of over $500,000.

But the record evidence shows it was Afremov who initially requested Lanterman and CFS's expert assistance in analyzing the data. Afremov's counsel never inquired about the format of the AGA data or the requisite steps needed to compile and review the data. Instead, they requested immediate production of documents. These facts demonstrate that the parties understood the scope of the work to be performed.

The district court also determined that there was no meeting of the minds on the terms of compensation to be paid to CFS. It cited trial testimony that Afremov's counsel understood "costs . . . incur[red]" in the April 18, 2007 letter to mean out-of-pocket costs, but Lanterman and CFS understood the terms to reflect CFS's normal, customary rates.

11

Viewing the evidence in the light most favorable to CFS, we conclude that the evidence supports a finding that CFS was to be paid its normal, customary rates. Neither the discharge order nor the April 18, 2007 letter defined the types of "costs" Afremov would pay for accessing, compiling, or reviewing the AGA data. The 2005 discharge order stated that Afremov would pay costs associated with the "access process" to the AGA data. The April 18, 2007 letter stated that Afremov would pay Lanterman "any costs, including reasonable attorney's fees" that he incurred "compil[ing] and review[ing]" the AGA data for Afremov's upcoming trial and the forthcoming subpoena. In particular, the phrase "any costs" used in the April 18, 2007 letter is both broad and ambiguous and does not support the district court's reasoning that the term was necessarily restricted to out-of-pocket costs. Moreover, any ambiguity concerning the terms of payment must be construed against Afremov, the drafter. *Hilligoss v. Cargill, Inc*., 649 N.W.2d 142, 148 (Minn. 2002).

Lanterman testified and was extensively cross-examined about the fees that CFS charged in the billing invoices. Berman testified that he knew that Lanterman had been paid its normal rates for his computer-forensic services in the 2005 shareholder dispute, which totaled approximately $2,000,000. The managing director of FTI Consulting, a company that provides computer-forensics services, reviewed CFS's billing invoices to Afremov and testified that FTI would have charged considerably more to complete the work. We conclude that the jury's finding that the discharge order covered CFS's first billing invoice has reasonable support in fact based on the broad language used to define costs in the discharge order, the April 18, 2007 letter, and witness testimony.

Afremov argues that he only agreed to pay out-of-pocket costs incurred by Lanterman as a fact witness and custodian of the AGA documents, and that he had hired another computer-forensic expert for his criminal defense. But the evidence demonstrates that Berman and Petrosinelli clearly asked Lanterman to perform computer-forensic services in compiling and reviewing documents. Had Afremov only subpoenaed Lanterman as a fact witness, Lanterman would have only been required to ensure that the data was available on the first day of trial. To the contrary, the parties' testimony demonstrates that Berman and Petrosinelli wanted Lanterman's expert computer-forensic assistance in reviewing and producing relevant documents in preparation for Afremov's defense five months before trial.

Because the jury's breach-of-contract finding has reasonable support in the record, the district court should have denied Afremov's JMOL motion and allowed the jury's verdict to stand. *Jerry's Enters.*, 711 N.W.2d at 816. We reverse the district court's grant of JMOL on the breach-of-contract claim.

## II.     The district court's jury instructions were erroneous.

"The district court has broad discretion in determining jury instructions and [an appellate court] will not reverse in the absence of abuse of discretion." *Hilligoss*, 649 N.W.2d at 147. The district court is not authorized to give a jury instruction that "give[s] prominence to and emphasize[s] particular facts disclosed by the evidence" in such a way that "singl[es] out elements or views upon the controversy which were proper for argument and discussion by counsel." *Domagala v. Rolland*, 787 N.W.2d 662, 669 (Minn. App. 2010), *aff'd*, 805 N.W.2d 14 (Minn. 2011).

13

Both parties argue that the district court erred in its jury instruction defining "costs" in the discharge order for the breach-of-contract claim. But Afremov contends that Lanterman and CFS are not entitled to a new trial because the error was harmless, as they failed to prove that a contract existed in the first place.

The district court stated on the record that it would define the word "costs" to refer to the discharge order, but did not explain its reasoning for excluding flat-rate fees or computer run-time. The discharge order stated that "[t]he costs resulting from the Bassford, Remele custody and administration of the files and the access process, are properly payable by Plaintiff Afremov." As noted earlier in this opinion, this language does not explicitly define costs, let alone that costs should be restricted to employee hours.

Here, the jury instructions emphasized only one form of contract damages, lost revenue from employee hours. But the measure of contract damages is generally "based on recovery of the expectancy or benefit of the bargain." *See, e.g.*, *Lesmeister v. Dilly*, 330 N.W.2d 95, 101 (Minn. 1983). Lanterman's testimony established that CFS's damages from Afremov's breach of contract included lost payments for computer run-time and flat-rate fees as well as analyst time.

The district court's error was not harmless. "An error is prejudicial if there is a reasonable likelihood that the giving of the instruction in question would have had a significant effect on the verdict of the jury." *Youngquist v. W. Nat'l Mut. Ins. Co.*, 716 N.W.2d 383, 386 (Minn. App. 2006) (quotation omitted). In answering the special verdict questions, the jury was tasked with finding the amount of damages Afremov owed CFS for breaching the contract. Special verdicts allow "the jury to make findings of ultimate facts

14

. . . without regard to the effect of their answers upon the ultimate outcome of the case." *McCourtie v. U.S. Steel Corp.*, 253 Minn. 501, 516, 93 N.W.2d 552, 562 (1958). Here, we conclude that the jury's proposed finding of damages in favor of CFS totaling $628,737.33 was entirely reconcilable with the record evidence. *See Dunn v. Nat'l Beverage Corp.*, 745 N.W.2d 549, 555 (Minn. 2008) (stating that "[i]f the answers to special verdict questions can be reconciled on *any* theory, the verdict will not be disturbed." (quotation omitted)).

Under Minn. R. Civ. P. 49.01(a), a jury returns a special verdict in the form of a special written finding upon each issue of fact, and the district court cannot "inform the jury of the effect of its answers on the outcome of the case." Here, the district court violated rule 49.01(a) when it informed the jury that an award of $628,737.33 in damages to Lanterman and CFS would violate its instructions. This comment was equivalent to telling the jury the conditions under which Lanterman and CFS could recover damages. *McCourtie*, 253 Minn. at 516, 93 N.W.2d at 562. And the district court's response to the jury's question substantially prejudiced Lanterman and CFS because the jury returned a significantly lower damages award of $104,568.75. We conclude that the erroneous jury instruction, coupled with the district court's reply instructing the jury on how CFS could recover on its breach-of-contract claim, resulted in substantial prejudice warranting a new trial on damages arising from CFS's first billing invoice. *Domagala*, 787 N.W.2d at 669, 675.

Both sides appeal the district court's award of unjust-enrichment damages to Lanterman and CFS. An unjust-enrichment claim is not available when there is an enforceable contract. *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838

15

(Minn. 2012).  Here, there is no basis for equitable relief in light of the jury's finding of a contract.  For this reason, we reverse the district court's unjust-enrichment award.

**Reversed and remanded.**